# EXHIBIT 1

**Defendant's Notice of Supplemental Authority**

*Gatore, et al. v. U.S. Dep't of Homeland Sec.*,
No. 1:15-cv-00459-RBW (D.D.C.)

September 1, 2017

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DL, et al., | ) |
|  | ) |
|  | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) |
| **v.** | ) **Case No: 05-cv-1437-RCL** |
|  | ) |
| **DISTRICT OF COLUMBIA, et al.,** | ) |
|  | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |

## MEMORANDUM OPINION

## I.    INTRODUCTION

This case comes before the Court on plaintiffs' motion for attorneys' fees, ECF No. 537. Plaintiffs brought claims under the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act, and District of Columbia law.  After many years of litigation which included class certification issues, summary judgment, trial, and appeals, this case is finally at its end. Plaintiffs now seek $9,760,487.55 in attorneys' fees and costs.  For the reasons stated below, this Court finds that plaintiffs are entitled to fees and costs, although not in this amount.  It will grant in part and deny in part plaintiffs' motion, but will seek a revised calculation from plaintiffs before ordering the District of Columbia to pay.

## II.    BACKGROUND

This case, originally filed in 2005, was brought by the parents of preschool age children with various disabilities who tried to obtain special education services from the District of Columbia Public Schools ("DCPS"), alleging violations of the Individuals with Disabilities Education Act ("IDEA"), the Rehabilitation Act, and District of Columbia law, which require that

the District offer a "free and appropriate public education" ("FAPE") to disabled children.  These laws require "states to develop a 'practical method' to track which children are receiving special education services and to ensure that all children 'who are in need of special education and related services . . . are identified, located, and evaluated' within a timeframe set by the state—120 days in this case." *DL v. D.C.*, 860 F.3d 713, 717 (D.C. Cir. 2017) (citing 20 U.S.C. § 1412(a)(3)(A); 20 U.S.C. § 1414(a)(1)(C)(i)(I); D.C. Code § 38-2561.02(a)(1)).  States are additionally obligated "to provide a seamless transition when three-year-olds move from 'early intervention' programs (governed by IDEA Part C) to preschool (governed by IDEA Part B)." *Id.* (citing 20 U.S.C. §§ 1412(a)(9), 1435(a)(8)(A), 1437(a)(9); 34 C.F.R. § 303.209).  These provisions are known as the "Child Find" duty.

Plaintiffs alleged numerous knowing, pervasive, and systemic failures to comply with the "Child Find" requirement.  The procedural history of this case is set out in the many opinions from both this Court and the Court of Appeals.  It was most recently summarized in *DL v. D.C.*, 860 F.3d 713 (D.C. Cir. 2017), and need not be repeated in full here.  It is sufficient to note that plaintiffs ultimately brought claims related to four subclasses:

> (1) disabled three-to-five-year-olds whom the District failed to identify for the purpose of offering special education services; (2) disabled three-to-five-year-olds whom the District failed to give an initial evaluation within 120 days of being referred for special education services; (3) disabled three-to-five-year-olds whom the District failed to give an "eligibility determination"—*i.e.*, a decision as to whether they qualify for IDEA services—within 120 days of being referred; and (4) all children who transitioned from early intervention to preschool programs, and whom the District denied a "smooth transition" by age three.

*DL*, 860 F.3d at 719.

In 2014, the Court found that "the District was liable for violating the IDEA and District law for the period up to April 6, 2011" for all four subclasses.  *DL v. D.C.*, 194 F. Supp. 3d 30, 37 (D.D.C. 2016).  It ruled for defendants, however, "on (1) plaintiffs' IDEA and District law claims related to the failure timely to evaluate children for special education and related services for the

2

period from April 6, 2011 to the present [Subclass 2], and (2) all of plaintiffs' Rehabilitation Act claims for the period from March 22, 2010 to the present." *Id.* Then, at trial, plaintiffs alleged that the District violated the IDEA with respect to Subclasses 1, 3, and 4 from April 6, 2011 through the present, and that the District violated the Rehabilitation Act with respect to all four subclasses for the period up to March 22, 2010. *Id.* at 37–38. After trial, the Court found that the District had violated the IDEA with respect to Subclasses 1, 3, and 4 from April 6, 2011 through the first day of trial (November 12, 2015), and that it violated the Rehabilitation Act with respect to all four subclasses through March 22, 2010. *Id.* at 88–96. The breakdown of each party's success is as follows:

|  | IDEA Claims through April 6, 2011 | IDEA Claims from April 6, 2011 to present | Rehabilitation Act Claims through March 22, 2010 | Rehabilitation Act Claims from March 22, 2010 to present |
|---|---|---|---|---|
| **Subclass 1** | Plaintiffs | Plaintiffs | Plaintiffs | Defendants |
| **Subclass 2** | Plaintiffs | Defendants | Plaintiffs | Defendants |
| **Subclass 3** | Plaintiffs | Plaintiffs | Plaintiffs | Defendants |
| **Subclass 4** | Plaintiffs | Plaintiffs | Plaintiffs | Defendants |

On May 18, 2016, this Court found that "[p]laintiffs have prevailed on both IDEA and Rehabilitation Act claims. Pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I) (IDEA) and 20 U.S.C. § 794a(b) (Rehabilitation Act), the District shall pay plaintiffs' reasonable attorneys' fees and related nontaxable expenses associated with litigating this suit." May 18, 2016 Order ¶ 30, ECF No. 521. Plaintiffs now request fees for two periods of time: 1) through November 16, 2011 (Period 1); from November 17, 2011 to June 22, 2016 (Period 2). Plaintiffs originally requested fees and costs totaling $10,010,956, using the current rates set out in the LSI Matrix. After briefing, they now request $9,760,487.55 using LSI Matrix rates. The law firm of Terris, Pravlik & Millian, LLP ("TPM"), lead counsel in this case, requests fees totaling $8,962,597.98 and costs totaling

$259,409.83.  Professor Jeffrey S. Gutman, who oversaw a clinic at The George Washington University Law School in which students worked on this case, requests fees totaling $135,476.32. Co-counsel Margaret A. Kohn, who served as class counsel and the primary contact with the named plaintiffs, requests fees totaling $380,009.56 and costs totaling $1,727.61.  Co-counsel Cyrus Mehri, who performed work related to class certification and settlement, requests fees totaling $21,266.25.

The District argues that the Court should award fees using the USAO Matrix, and should use historic (2012) rates with interest for Period 1, and current rates for Period 2.  The District also argues that the requested fees should be reduced because plaintiffs billed an unreasonable number of hours for many tasks, because they improperly billed for matters in which they failed to prevail, and because they failed to exercise reasonable billing judgment.  It also argues that fees for co-counsel should be reduced substantially or denied.  Furthermore, it argues that plaintiffs' costs are excessive and should be reduced significantly, and that expert fees are not reimbursable.  Finally, the District argues that the IDEA's statutory fee cap requires that the Court deny plaintiffs' request unless and until plaintiffs demonstrate actual class membership.  The United States has submitted a statement of interest pursuant to 28 U.S.C. § 517, and argues that the USAO Matrix is the appropriate fee matrix to use in this and other cases.

## III.    LEGAL STANDARDS

### A.    *Legal Framework for Determining Fee Awards*

This Court has recently had occasion to discuss the legal framework surrounding attorneys' fees in IDEA cases, which often come before this District Court.  The Court thus refers to its own opinion in *Joaquin v. D.C.*, 210 F. Supp. 3d 64 (D.D.C. 2016), in which it summarized the analysis as follows:

The IDEA provides that courts may award reasonable attorney's fees to prevailing parties. 20 U.S.C. § 1415(i)(3)(B)(i).  The fees must be "based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." *Id.* § 1415(i)(3)(C).  A three part analysis guides the assessment of whether a requested fee award is reasonable: "First, the court must determine the 'number of hours reasonably expended in litigation.'  Second, it must set the 'reasonable hourly rate.'  Finally, it must determine whether use of a multiplier is warranted." *Eley v. District of Columbia*, 793 F.3d 97, 100 (D.C. Cir. 2015) (internal citations omitted).  To determine a reasonable hourly rate, the court considers "(1) the attorney['s] billing practices, (2) the attorney['s] skill, experience, and reputation and (3) the prevailing market rates in the relevant community." *Id.* (internal quotation marks omitted).  Attorney's fee litigation employs a burden-shifting scheme:

> The fee applicant bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates. Once an applicant meets this initial burden, a presumption applies that the number of hours billed and the hourly rates are reasonable.  At that point, the burden shifts to the opposing party to provide specific contrary evidence tending to show that a lower rate would be appropriate.

*Flood v. District of Columbia*, No. CV 15–497 (BAH), 172 F.Supp.3d 197, 203, 2016 WL 1180159, at *3 (D.D.C. Mar. 25, 2016) (internal citations and quotation marks omitted).

210 F. Supp. 3d at 68.  The Court will specifically address the standards for determining reasonable

hourly rates and the reasonableness of hours billed in Parts IV.B.1 and IV.C.1, *infra*.

### B.    *Fee Caps*

In certain circumstances, there is no need to conduct the aforementioned fee award

analysis.  In 1999, Congress capped the fees payable by the District in IDEA cases.  *See* Omnibus

Consolidated and Emergency Supplemental Appropriation Act of 1999, Pub. L. No. 105–277, §

130, 112 Stat. 2681 (1998).  In 2003, Congress set a flat cap of $4,000 on attorneys' fees for IDEA

actions.  *See* Consolidated Appropriations Act of 2003, Pub. L. No. 108–7, § 144, 117 Stat. 11

(2003).  In 2009, Congress passed the final rider relating to IDEA attorneys' fees, stating:

Notwithstanding section 615(i)(3)(B) of the Individuals with Disabilities Education Act (20 U.S.C. § 1415(i)(3)(B)), none of the funds contained in this Act or in any other Act making appropriations for the government of the District of Columbia for fiscal year 2009 or any succeeding fiscal year may be made available—

(1) to pay the fees of an attorney who represents a party in or defends an IDEA proceeding which was initiated prior to the date of the enactment of this Act in an amount in excess of $4,000 for that proceeding.

Omnibus Appropriations Act, Pub. L. No. 111–8, § 814, 123 Stat. 524 (2009). The 2009 rider did not provide a fee cap for future cases.

However, the D.C. Circuit found that "the 'evident intent' of the [2009] statute is to address individual IDEA proceedings, not class actions." *Blackman v. D.C.*, 633 F.3d 1088, 1092 (D.C. Cir. 2011). Thus,

the cap does not preclude the Court from ordering defendants to pay and—more importantly—does not preclude the defendants from paying reasonable attorneys' fees to the plaintiff classes, so long as the total amount paid by the defendants does not surpass the statutory fee cap multiplied by the total number of members of the plaintiff class.

*Id.* (quoting and agreeing with the reasoning of the District Court) ("As it is undisputed that the classes number in the hundreds, if not thousands, the plain and unambiguous language of the statute would seem to make the district court's conclusion unassailable and compel us to affirm the fee award order."). Thus, the fee cap prohibits fee awards in class actions that are greater than $4,000 multiplied by the number of class members.

## IV. ANALYSIS

### A. *Fee Caps*

Because the applicability of fee caps would have an impact on the fee award in this case and would eliminate the necessity of conducting a lodestar analysis, the Court will address this issue first. The Court will discuss whether this entire case should be treated as an IDEA case or whether it should be treated as a Rehabilitation Act case, which has no fee cap requirements, and then will determine whether the caps apply in this case.

## 1.    IDEA vs. Rehabilitation Act

The Court first determines that this case should be treated as an IDEA case for the purpose of determining whether the fee caps are even relevant.  Plaintiffs brought claims under both the IDEA and the Rehabilitation Act, which have separate fee-shifting provisions.  *Compare* 20 U.S.C. § 1415(i)(3)(B)(i) *with* 29 U.S.C. § 794a(b).   The Rehabilitation Act, which prohibits discrimination on the basis of disability in programs receiving federal funding, states in its implementing regulations that "a recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap."  34 C.F.R. § 104.33.  In 2006, this Court set out the standard for Rehabilitation Act claims in the IDEA context:

> In order to state a claim under Section 504 of the Rehabilitation Act in IDEA cases, plaintiffs must show that "something more than a mere failure to provide the 'free and appropriate education' required by the [IDEA]'" has occurred.  *Walker v. District of Columbia*, 157 F. Supp. 2d 11, 35 (D.D.C. 2001) (Friedman, J.)[.]   Generally, plaintiffs who show either "bad faith or gross misjudgment" can prevail under Section 504 for IDEA violations.  *Id.*  Liability will not be imposed so long as the "state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals."  *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982).

*DL v. DC*, No. 05-1437, slip op. at 3–4 (D.D.C. Aug. 2, 2006) (ECF No. 55).

In 2010, this Court granted summary judgment in favor of plaintiffs with respect to their Rehabilitation Act claims through 2007 after finding that the District failed to comply with the IDEA and concluding that "defendants knew that their actions were legally insufficient, yet failed to bring themselves into compliance with their legal obligations, in violation of § 504 of the Rehabilitation Act," which showed "bad faith or gross misjudgment."  *DL v. D.C.*, 730 F. Supp. 2d 84, 100 (D.D.C. 2010).  In 2011, this Court "extend[ed] the holding of its August 10, 2010 Memorandum Opinion, and declare[d] that defendants violated Section 504 of the Rehabilitation

Act for the period January 1, 2008 to April 6, 2011 (the first day of the first trial) because, in violating the IDEA, defendants failed to exercise professional judgment in such a way as not to depart grossly from accepted standards among educational professionals and thus demonstrated bad faith or gross misjudgment." *DL v. D.C.*, 845 F. Supp. 2d 1, 24 (D.D.C. 2011) (internal citation omitted). After disputes regarding class certification, the plaintiffs were broken into the four aforementioned subclasses. This Court then concluded in 2016 that the District violated the Rehabilitation Act through March 22, 2010 with respect to Subclass 1 "because it demonstrated bad faith and gross misjudgment with regard to its FAPE and Child Find obligations;" that it violated the Rehabilitation Act with respect to Subclass 2 through March 22, 2010 "because it demonstrated bad faith and gross misjudgment with regard to its obligation to provide timely initial evaluations for special education and related services;" that it violated the Rehabilitation Act with respect to Subclass 3 through March 22, 2010 "because it demonstrated bad faith and gross misjudgment with regard to its obligation to provide timely eligibility determinations for special education and related services;" and that it violated the Rehabilitation Act with respect to Subclass 4 through March 22, 2010 "because it demonstrated bad faith and gross misjudgment with regard to its obligation to provide smooth and effective transitions from Part C to Part B services." *DL*, 194 F. Supp. 3d at 96. All of the obligations mentioned are IDEA obligations.

Thus, based on the above, the Court concludes that this case is at its heart an IDEA case. It is about whether the District of Columbia violated the IDEA by failing to identify, locate, evaluate, or offer special education services, and/or failed to ensure a smooth and effective transition for disabled preschool children. The Rehabilitation Act claims and the Court's various findings regarding them rest on top of the IDEA claims. The Court found that the District violated the Rehabilitation Act *because* it violated the IDEA in several ways and *because* the District

showed bad faith or gross misjudgment.  The Rehabilitation Act claims do not exist completely

independently of the IDEA claims.  Because the Court concludes that this case should be treated

as an IDEA case for the purposes of this fee dispute, it now turns to whether the IDEA fee caps

are applicable.

### 2.    IDEA Fee Caps

The fee caps are inapplicable based on the subclass sizes.  Plaintiffs seek $9,760,487.55 in

fees and expenses, but "since plaintiffs cannot recoup expert expenses under the IDEA, those

expenses ($121,207.82) should not be subject to the fee cap." Pls.' Mot. 36, ECF. No. 537 (internal

citations  omitted).    Subtracting  $121,207.82  from  $9,760,487.55  equals  $9,639,279.73.

$9,639,279.73 divided by $4,000 (the fee cap) equals 2,409.82.  Therefore, there must be less than

2,410 children in the class for the fee caps to be applicable.

The Court previously found that, with respect to Subclass 1, "The District Failed to Provide

Special Education and Related Services to Thousands of Children Prior to March 22, 2010." *DL*,

194 F. Supp. 3d at 78.  Regarding Subclass 2, it found that "The District Failed to Provide Timely

Initial Evaluations to over a Thousand Children prior to March 22, 2010." *Id.* at 80.  For Subclass

3, it found that "The District Failed to Provide Timely Eligibility Determinations to over a

Thousand Children prior to March 22, 2010." *Id.* at 81.  Finally, with respect to Subclass 4, the

Court found that "The District Failed to Provide Smooth and Effective Transitions to Many

Hundreds of Children Prior to March 22, 2010." *Id.*

Using conservative estimates, this means that the District failed to provide special

education and related services to at least 2,000 children ("thousands of children), failed to provide

timely initial evaluations to at least 1,000 children ("over a thousand children"), failed to provide

timely eligibility determinations to at least 1,000 children ("over a thousand children", and failed

to provide smooth and effective transitions to at least 200 children ("many hundreds of children"). The sum of these figures is 4,200, which is greater than the less than 2,410 needed for the fee caps to apply.

Furthermore, when this Court certified the four subclasses, it addressed numerosity and stated the following:

> In just one year, 2008, the plaintiffs' expert estimates that the District failed to identify at least **1,152** disabled children. The second subclass, children who did not and will not receive initial evaluations within 120 days of referral, numbered at least **514** in 2010. Subclass three, children who did not and will not receive eligibility determinations within 120 days of referral, included at least **1,057** children in 2008 through 2010. The final subclass, children who did not and will not receive a smooth and effective transition from Part C to Part B services, included **163** children in 2008.

*DL v. D.C.*, 302 F.R.D. 1, 11 (D.D.C. 2013) (internal citations omitted), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017). Thus, in these limited timeframes (2008 for Subclass 1, 2010 for Subclass 2, 2008 – 2010 for Subclass 3, and 2008 for Subclass 4), the class size numbered 2,886. And, although the Court notes and plaintiffs acknowledge that some overlap may have occurred amongst the subclasses, *see* Gluckman Aff. ¶ 89, Pls. Ex. 69, ECF No. 566-2, the Court agrees that given that class members have claims spanning thirteen years, the likelihood that duplication is so numerous that it renders the class size small enough for the fee caps to apply is extremely low if not virtually impossible. Even if all 1,152 members of Subclass 1 in 2008 were the same children as those falling into all of the other subclasses, for the fee caps to apply the Court would have to find that in the other 12 years (all years excluding 2008), only 1,258 children fell into the class. Given the pervasiveness of the District's failures to comply with the IDEA, the Court considers this to be extremely unlikely.

Finally, the Court also accepts plaintiffs' calculations—found in paragraphs 90 through 92 of Mr. Gluckman's affidavit—regarding the size of Subclass 1 based on population size and

percentages of children receiving special education and related services between 2003 and 2014. Plaintiffs' counsel, after aggregating the necessary data, explains the following:

> on average, 4.51% of 3-5-year-olds received special education and related services in the District between 2003 and 2014. The table also shows that, on average, there were 18,434 3-5-year-olds in the District over that period. 4.51% of 18,434 is an average of 832 children served per year. The Court found that the District should be serving at least 8.5% of the 3-5-year-old population per year. 8.5% of 18,434 is 1,567. The difference between 1,567 and 832 children, which is 735 children, is the average subclass 1 class size for a single year.
>
> The product of 735 (the average number of children in subclass 1) and 12 (the number of years between 2003 and 2014) is 8,820. That includes children ages 3, 4, and 5, and would over-count children because the same child may remain unserved over multiple years. A rough method of eliminating this over-counting is to divide the total by 3, which yields 2,940. That eliminates the potential over-counting problem and conservatively estimates the number of class members because many children will not be in the class over multiple years. This number is a reasonable estimate of the population of subclass 1 between 2003 and 2014. It is conservative because it does not include the members of subclasses 2, 3, and 4, and ends at 2014. 2,940 is larger than 2,410 and 2,441, the numbers needed to make the fee cap irrelevant.

Gluckman Aff. ¶¶ 91–92. The Court accepts these calculations. They, along with all of the aforementioned findings, show that the fee caps are not applicable in this case because the class size is larger than 2,410.

### B.  Reasonable Hourly Rates

Having concluded that fee caps do not apply, the Court now turns to the traditional lodestar analysis regarding fee awards, first considering the appropriate reasonable hourly rate.

### 1.  Legal Standards

With respect to reasonable hourly rates, parties and courts generally use one of several fee matrices because, as the D.C. Circuit has noted, "the matrices do provide a useful starting point." *Covington v. D.C.*, 57 F.3d 1101, 1109 (D.C. Cir. 1995). First, the most commonly used is the *Laffey* Matrix, derived from *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 374 (D.D.C. 1983) *aff'd in part, rev'd in part on other grounds,* 746 F.2d 4 (D.C. Cir. 1984), which compiled a

schedule of prevailing market rates in Washington, D.C. based on years of experience.  Because

*Laffey* was decided in the early 1980s, the rates are updated each year using the Consumer Price

Index for All Urban Consumers (CPI-U) for Washington-Baltimore to account for changes in the

cost of living.  The United States Attorney's Office for the District of Columbia ("USAO") updates

and maintains the *Laffey* Matrix.  *See* https://www.justice.gov/usao-dc/civil-division.  Beginning

in May 2015, the USAO stopped issuing *Laffey* matrices using this methodology, instead issuing

what it refers to as the USAO Matrix.  *See* Statement of Interest of the United States 3, ECF No.

564.  The USAO Matrix's "base hourly rates were calculated using statistically significant samples

of average hourly rates for 2011 in survey data for the D.C. metropolitan area, as reported in ALM

Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics ('SLFE'). . . .  The USAO

Matrix employs the Producer Price Index-Office of Lawyers (PPI-OL) index to adjust for inflation

rates for years after 2011."  *Id.* at 3–4.[1]  In the context of IDEA fee litigation, specifically, several

courts within this District have used the USAO/*Laffey* rates as a starting point, but have awarded

fees at 75% of those rates.  *See Joaquin*, 210 F. Supp. 3d at 67 (internal citations omitted).

Critics of the *Laffey*/USAO matrices have advocated for the use of a competing matrix

known as the LSI ("Legal Services Index") Matrix.  *Eley v. D.C.*, 793 F.3d 97, 101 (D.C. Cir.

2015).  It "uses the Legal Services Index of the Bureau of Labor Statistics to adjust for inflation.

Developed by Michael Kavanaugh, an economist from Hawaii, the LSI *Laffey* Matrix adjusts for

the increases in costs for legal services only."  *Id.* at 101–02.  "Rather than tracking inflation levels

specific to Washington, D.C., the LSI *Laffey* Matrix tracks the national rate of change in the cost

of legal services."  *Id.* at 102.  LSI *Laffey* rates tend to be higher than *Laffey*/USAO rates.

---

[1] "The United States does not oppose application of the USAO Matrix methodology to earlier periods. Similarly, it does not oppose application of the *Laffey* Matrix methodology to periods after May 2015. The USAO-DC, however, has not issued a USAO Matrix for periods prior to June 1, 2015, nor is it issuing *Laffey* Matrices for periods after May 2015."  Statement of Interest at 3 n.1.

The D.C. Circuit has declined to decide whether any of the matrices apply to IDEA cases, and if so, which version. *See id.* at 105. Nonetheless, the *Eley* case, "appears to have reframed the inquiry surrounding a plaintiff's burden to show that the proposed rates are reasonable." *Joaquin*, 210 F. Supp. 3d at 68. In *Joaquin*, this Court adopted Chief Judge Howell's application of *Eley*, in which she concluded the following:

> IDEA fee applicants may meet their burden of demonstrating that the requested reimbursement rate is reasonable in two alternate ways: "First, the applicant may demonstrate that IDEA proceedings qualify as 'complex federal litigation,' to which *Laffey* rates presumptively apply. Second, alternatively, a fee applicant may demonstrate that rates customarily charged by IDEA practitioners in the District are comparable to those provided under the USAO *Laffey* Matrix." *Flood*, 172 F. Supp. 3d at 210, 2016 WL 1180159, at *9.
>
> ***
>
> [T]he D.C. Circuit in both *Eley* and *Salazar v. District of Columbia*, 809 F.3d 58, 64 (D.C. Cir. 2015) "suggest[ed] a categorical approach to identifying reasonable reimbursement rates for prevailing IDEA plaintiffs." *Id.* at 206, 2016 WL 1180159, at *6. In the past, members of this Court have "drawn a distinction between 'complex' IDEA cases, for which full *Laffey* rates may be available, and 'non-complex' cases that generally entitle a prevailing claimant to reimbursement at a reduced rate." *Id.* at 208, 2016 WL 1180159, at *7. Under the post-*Eley* approach outlined by Chief Judge Howell, however, reasonable rates are to be determined without regard to the complexity of the particular IDEA litigation at hand. *See id.* at 206–09, 2016 WL 1180159, at *6–8.
>
> Additionally, under this framework, even if IDEA litigation ultimately categorically does not qualify as complex federal litigation, a plaintiff may also "justify reimbursement at *Laffey* rates based simply on direct evidence of fees typically collected by her attorney and other attorneys engaged in IDEA litigation in the District of Columbia." *Flood*, 172 F. Supp. 3d at 210, 2016 WL 1180159, at *9. To prove this "prevailing market rate," fee applicants have the burden of "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Applicants may submit fee matrices, which serve as a starting point for calculating the prevailing market rate. *Eley*, 793 F.3d at 100. These may be supplemented by other evidence including "surveys to update [the matrices]; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." *Id.* at 100 (internal quotation marks omitted).

13

*Joaquin*, 210 F. Supp. 3d at 68–69.

The Supreme Court has recognized that in some cases, where the work was performed years prior to receiving any fees, it may be appropriate to award fees using current rates despite the fact that the rates in place at the time the services were rendered were different (that is, lower) than those currently in place:

> compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute

*Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283–84 (1989). "Courts may therefore use either current or historic rates in calculating the fee award and, 'to roughly compensate for delay in payment, a district court has the authority to award current market rates instead of historic market rates.'" *Radtke v. Caschetta*, No. 06-CV-2031-RCL, 2017 WL 2483720, at *12 (D.D.C. June 7, 2017).

Although there is no test to determine whether current or historic rates should be used, courts have considered the following: 1) whether current rates would create a windfall for plaintiffs' counsel; 2) the party at fault for the delay; and 3) the length of the delay between the time the services were rendered and the time of payment. *Id.* (collecting cases).

The Court will first examine whether plaintiffs have demonstrated that IDEA proceedings qualify as complex federal litigation to which one of the matrices presumptively applies, and which matrix is appropriate, then will consider whether plaintiffs have shown that rates customarily charged by IDEA practitioners in the District are comparable to those provided under the LSI Matrix. Finally, the Court will determine whether current or historic rates should apply.

## 2. Analysis

### a) IDEA Litigation is Complex Federal Litigation

It appears that plaintiffs here are largely advocating for the first approach to determining the reasonable hourly rates, arguing that they are entitled to fees based on market rates for complex federal litigation. They argue that prevailing market rates are those listed in the LSI Matrix. The District does not argue that IDEA litigation is not complex—it identifies IDEA litigation as "a submarket of federal complex litigation" on several occasions—but instead argues that USAO rates more accurately reflect the prevailing market rates for complex federal litigation.

Thus concluding that IDEA litigation qualifies as complex federal litigation to which one of the fee matrices presumptively applies, the Court must determine whether the USAO Matrix or the LSI Matrix is appropriate. This issue ultimately comes down to dueling expert witness affidavits. While recognizing that each expert has sufficient qualifications and both present fairly comprehensive arguments, the Court agrees with the District's expert that the USAO Matrix is the more appropriate tool for determining attorneys' fees in cases such as this one. Fee matrices contain two components: "a set of market rates for a base period, and an index by which those rates are adjusted annually for changes in the cost of living." U.S. Statement of Interest 5, ECF No. 564. The base rates supporting the LSI matrix are provided by a 1989 declaration submitted by attorney Joseph Yablonski for use in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc) ("*SOCM*"), which ultimately resulted in a settlement. Then, in *Salazar v. District of Columbia*, 123 F. Supp. 2d 8 (D.D.C. 2000), a § 1983 Medicaid class action, an expert witness for the plaintiffs adjusted Mr. Yablonski's base rates using the Legal Services Index ("LSI") component of the Consumer Price Index. This new matrix was accepted for use by the *Salazar* court. *Id.* at 14–15. The Matrix is adjusted annually for inflation using the Consumer

Price Index for Legal Services. The base hourly rates for the USAO Matrix "were calculated using statistically significant samples of average hourly rates for 2011 in survey data for the D.C. metropolitan area, as reported in ALM Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics ('SLFE')." United States Statement of Interest at 3. The Matrix is adjusted annually for inflation using the Producer Price Index-Office of Lawyers (PPI-OL).

The Court finds that, based on the evidence submitted by both parties, the USAO Matrix is more reliable and unbiased. As the United States points out in its statement of interest, the base rates underlying the LSI Matrix date back to 1989, while the rates underlying the USAO Matrix are based on 2011 data. More importantly, the LSI Matrix rates are based on the declaration of one attorney—Mr. Yablonski, who believed that the *Laffey* Matrix was too conservative—for his own use in *SOCM*, which eventually ended in a settlement without a decision from the court regarding appropriate fee rates. *See* Yablonski Decl., Pls.' Ex. 33, ECF No. 537-33. Mr. Yablonski explained that in the course of preparing his Matrix, he spoke with attorneys from several firms (he lists seven specifically) and "compared the rates [he] had found with the rates set forth in two broad-ranging surveys of hourly rates published in the National Law Journal in November 1987 and November 1988." *Id.* ¶¶ 5–6. As the District's expert, Dr. Laura Malowane, notes, however, "Mr. Yablonski never explained how he identified the attorneys and firms to sample, the number of attorneys he spoke with, how many data points were collected to derive each individual billing rate in the matrix, or how many data points were collected in total." Malowane Decl. ¶ 15, Def.'s Ex. 11, ECF No. 554-11. Plaintiffs' expert, Dr. Michael Kavanaugh, states that Mr. Yablonski's survey "was an expert survey that targeted attorneys who were performing complex federal litigation and asked for billing rates for defined levels of experience,"

Second Kavanaugh Decl. ¶ 33, Pls.' Ex. 78, ECF No. 566-11, but does not specifically address the shortcomings identified by Dr. Malowane.

Furthermore, reliance on National Law Journal surveys has been called into question by other courts. Judge Friedman in *Blackman v. D.C.* cited to the defendants' argument that the National Law Journal "is not a scientific study and that it relied on self-reported rates, which firms may reduce in practice, and that those rates came from the largest and most prestigious law firms, not from a representative sampling of firms" in determining that the USAO *Laffey* Matrix should apply. 677 F. Supp. 2d 169, 176 (D.D.C. 2010), *aff'd*, 633 F.3d 1088 (D.C. Cir. 2011). The National Law Journal was also criticized by Judge Sullivan, who found that it was inapposite in a case where the plaintiff's attorneys did not practice in large law firms because it "only examines the rates of the nation's 250 largest law firms, which range in size from 392 to 1092 attorneys." *Heller v. D.C.*, 832 F. Supp. 2d 32, 45–46 (D.D.C. 2011). More recently, Judge Mehta has noted that the National Law Journal "is of limited evidentiary value for purposes of establishing the prevailing market rates in Washington, D.C., for civil rights and copyright litigation," because it "does not . . . distinguish billing rates for partners and associates in terms of years of experience, the type of work performed, or the law firm's location." *Prunty v. Vivendi*, 195 F. Supp. 3d 107, 114 (D.D.C. 2016). This Court has, in fact, rejected reliance on the National Law Journal, agreeing with Chief Judge Howell that "the National Law Journal Billing Survey 'is of limited value absent a showing that these rates also prevail in the particular context of IDEA matters.'" *Joaquin*, 210 F. Supp. 3d at 74 (D.D.C. 2016) (quoting *Eley v. D.C.*, 201 F. Supp. 3d 150, 161 (D.D.C. 2016)).

On the other hand, the Court finds that the District has submitted evidence showing that the USAO Matrix had more indicia of reliability and more accurately represents prevailing market rates. The USAO Matrix "begins with 2011 average hourly attorney rates derived from ALM

17

Legal Intelligence's 2011 Survey of Law Firm Economics," which "represents actual average billing rates of attorneys from all size firms in the Washington, DC metropolitan area." Malowane Decl. ¶ 6. Further, as Dr. Malowane explains,

> The data used by the USAO Matrix are based on a statistical survey of hundreds of attorneys in the Washington, DC area. Questionnaires are mailed out and responses are tallied. Sampling frame and design are clearly stated in the survey and a particular billing rate is provided in the survey results only if there is sufficient statistical data to assure its accuracy. In practical terms this means that for each billing rate of each experience level there must be a sufficient number of firms and individual attorneys providing data to determine that rate. If there is not a sufficient number of survey respondents for a particular rate, the billing rate is not provided in the survey results as it is deemed to not be sufficiently reliable. These survey parameters ensure that the data published in the SLFE are reliable.

*Id.* ¶ 14. Furthermore, the USAO Matrix more accurately captures an individual's fees because it has more narrowly defined categories of years of experience. *Id.* ¶ 22. Whereas the LSI Matrix begins with the category of "1–3 years," ends with "20+ years," and contains a total of five experience categories, the USAO Matrix begins with the category of "less than 2 years," ends with "31+ years," and contains a total of nine experience categories. *Id.* ¶ 21.

The Court is also not swayed by plaintiffs' own market data, which is summarized in Exhibit 48, and purports to show that actual market rates are more closely aligned with the LSI Matrix. As the District notes, however, several methodological issues are present in this data. First, plaintiffs rely in part on billing rates in bankruptcy matters, which are generally not conducted for fee paying clients and which tend to be higher than rates charged for other types of cases. Plaintiffs have also not included the rates for practitioners without the labels of "partner" or "associate," such as those who are titled "counsel" or "of counsel." Furthermore, as explained in Part IV.B.2.b, *infra*, much of plaintiffs data is unhelpful in determining whether the "rates customarily charged by IDEA practitioners in the District are comparable to those provided under" the LSI Matrix because 1) the affiants are not IDEA practitioners, and 2) it is unclear whether they actually *received* these rates.

18

It is clear that this is an issue on which minds differ within this Circuit. The Court acknowledges that the LSI matrix has been adopted and used by other courts, including the D.C. Circuit which found in *Salazar* that the district court "appropriately required the Plaintiffs to demonstrate the propriety of the rates they sought (*i.e.*, under the LSI *Laffey* Matrix)." *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 64 (D.C. Cir. 2015). The *Salazar* court also found, however, that the District failed to rebut the plaintiffs' arguments regarding the propriety of the LSI matrix, and therefore found that LSI Matrix rates were appropriate. *See id.* at 65. Here, the District (as well as the United States in its statement of interest) has rebutted plaintiffs' arguments to the satisfaction of this Court. Without guidance from the D.C. Circuit regarding whether IDEA litigation should be treated as complex federal litigation, and if so, which fee matrix applies— beyond a brief concurrence of Judge Kavanaugh stating that "United States Attorney's Office *Laffey* matrix is appropriate for IDEA cases," *Eley*, 793 F.3d at 105 (Kavanaugh, J., concurring)— this Court is persuaded that the USAO Matrix is the appropriate fee matrix to apply.

b)      *Rates Customarily Charged by IDEA Practitioners*

Fee applicants may also demonstrate that the "rates customarily charged by IDEA practitioners in the District are comparable to those provided under" one of the matrices. *Joaquin*, 210 F. Supp. 3d at 68. Plaintiffs here, however, have failed to show that IDEA practitioners customarily charge and receive rates equivalent to those found in the LSI Matrix. First, and most importantly, although plaintiffs submitted numerous affidavits and declarations stating that the affiant charged rates in line with the LSI Matrix, none of those rates were charged by IDEA practitioners. *See* Pls.' Exs. 50–68, ECF Nos. 537-50–537-68. These cannot be used to support the argument that *IDEA practitioners* customarily charge rate comparable to those in the LSI Matrix.

Furthermore, this lack of evidence is compounded by the fact that many of the affidavits and declarations discuss rates billed or charged, not rates actually *received*. *See* Bravin Decl. ¶ 6, Pls.' Ex. 50, ECF No. 537-50 (describing rates "charged" and "applied in billing its clients"); Goldsmith Decl. ¶¶ 7–8, Pls.' Ex. 51, ECF No. 537-51 (discussing "billing rate[s]" and "hourly rates charged"); Clement Decl. ¶ 24, Pls.' Ex. 52, ECF No. 537-52 (discussing rates "billed"); Hearne Decl. ¶¶ 5, 7, 11, 25, Pls.' Ex. 53, ECF No. 537-53 (discussing amounts billed and rates charged); Davidson Decl. ¶¶ 5, 8, 13, 14, Pls.' Ex. 54, ECF No. 537-54 (testifying to familiarity with billing rates, "hourly rates typically charged by firms," "rates charged or sought by firms," and "rates that are charged for defense work in the employment field"); Supplemental Davidson Decl. ¶¶ 16-17, Pls.' Ex. 55, ECF No. 537-55 (stating that lawyers "have accepted Laffey rates," but that LSI rates sought are reasonable); Cacace Decl. ¶¶ 14-15, Pls.' Ex. 57, ECF No. 537-57 (describing the amounts her law firm "customarily charges to its paying clients" and her own "billing rate"); Pls.' Ex. 59, Email from Meghan Largent, ECF No. 537-59 (discussing the amount "requested"); Light Decl. ¶¶ 6-7, Pls.' Ex. 62, ECF No. 537-62 (testifying that while his retainer agreement reflects rates at Enhanced *Laffey* rates, some clients also receive discounts in the form of hourly caps, pro bono representation, or contingency fee arrangements); Amunson Decl. ¶¶ 11, 14-16, Pls.' Ex. 64, ECF No. 537-64 (discussing rates sought); Corn-Revere Aff. ¶ 10, Pls.' Ex. 65, ECF No. 537-65 (identifying a billing rate); Lewin Aff. ¶¶ 12–13, Pls.' Ex. 67, ECF No. 537-67 (discussing an hourly rate charged); Coburn Aff. ¶¶ 5, 15, Pls' Ex. 68, ECF No. 537-68 (discussing his hourly rate and the rate sought).   It is unclear whether such rates were charged/billed *and* received.   This Court has previously rejected such evidence as sufficient to show that LSI Matrix is appropriate, *see Joaquin*, 210 F. Supp. 3d at 74, and another district court

has noted the difference between charging fees at certain rates and collecting fees at those rates, *see Eley v. D.C.*, 201 F. Supp. 3d 150, 161 (D.D.C. 2016).

Finally, plaintiffs do not submit "evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." *Eley*, 793 F.3d at 101. Plaintiffs identify three cases in which counsel was awarded fees in accordance with the LSI Matrix: *Salazar v. District of Columbia*, 809 F.3d 58 (D.C. Cir. 2015); *Electronic Privacy Information Center v. Department of Homeland Security*, No. 13-260, 2016 WL 3919810 (D.D.C. 2016); *Makray v. Perez*, 159 F. Supp. 3d 25 (D.D.C. 2016). None of these cases were IDEA cases. *Salazar* was a 42 U.S.C. § 1983 Medicaid class action, *Electronic Privacy Information Center* was a FOIA case, and *Makray* was a Title VII discrimination case. This Court is not aware of any opinions awarding fees at LSI Matrix rates in IDEA cases. Courts, including this one, have found instead that use of the LSI Matrix is not warranted in specific IDEA cases. *See Joaquin*, 210 F. Supp. 3d at 74; *Flores v. D.C.*, 857 F. Supp. 2d 15, 20 (D.D.C. 2012); *Rooths v. D.C.*, 802 F. Supp. 2d 56, 61–62 (D.D.C. 2011). In fact, as has been discussed in countless other cases, the dispute in IDEA cases often centers around whether plaintiffs' counsel are entitled to full *Laffey*/USAO rates or 75% of those rates.

In sum, considering the evidence presented by plaintiffs in support of the use of the LSI Matrix in complex cases, the evidence presented in rebuttal by the District that the USAO Matrix is more appropriate, and the lack of evidence that IDEA practitioners customarily charge rates in line with the LSI Matrix, the Court concludes that the reasonable hourly rates to be used in this case are those set forth in the USAO Matrix. The Court now turns to whether current or historic rates should apply.

### c) *Current vs. Historic Rates*

Beyond arguing that the USAO Matrix should determine the reasonable hourly rates in this case, the District argues that plaintiffs' counsel should be compensated for work performed during Period 1 with 2012 USAO rates plus interest, and should receive current rates for Period 2.

The Court sees no reason to unnecessarily complicate matters in this case by awarding historic rates plus interest for Period 1. The District appears to concede that there has been a sufficient delay in payment that warrants some compensation by suggesting that interest be included. It has presented no convincing reason, however, why this Court should undertake the process of calculating interest when the process for compensating such a delay has been set out by the Supreme Court in *Jenkins*. The District's real reasoning appears to be that "historical rates with interest result in a smaller award of attorney's fees to plaintiffs' counsel for period 1." Defs.' Opp'n at 28, ECF No. 554. The District's desire to pay a lesser fee award is no reason for this Court to depart from the Supreme Court's instructions. Current rates shall be used for both Periods 1 and 2.

### C. *Reasonableness of Hours Billed*

After determining the appropriate billing rate, the next step in determining a fee award is determine whether the number of hours billed are reasonable.

### 1. **Legal Standards**

Courts must "make an independent determination whether or not the hours claimed are justified." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982). When determining fee awards, "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). "If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a

reasonable hourly rate may be an excessive amount." *Id.* at 436. However, "the fee award should

not be reduced simply because the plaintiff failed to prevail on every contention raised in the

lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the

court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.

The result is what matters." *Id.* at 435. Fees thus may be reduced for time spent on ultimately

unsuccessful claims, but those claims generally must be both unsuccessful and unrelated to the

successful claims. *See id.* at 434–35 ("[P]laintiff[s] may present in one lawsuit distinctly different

claims for relief that are based on different facts and legal theories," but "[t]he congressional intent

to limit awards to prevailing parties requires that these unrelated claims be treated as if they had

been raised in separate lawsuits, and therefore no fee may be awarded for services on the

unsuccessful claim"); *George Hyman Const. Co. v. Brooks*, 963 F.2d 1532, 1535 (D.C. Cir. 1992)

("*Hensley*'s first prong requires a trial court or ALJ to conduct an examination of the hours counsel

expended on each claim in the case, weeding out work done on unrelated unsuccessful claims from

any award."); *see also Ibrahim v. U.S. Dep't of Homeland Sec.*, 835 F.3d 1048, 1061 (9th Cir.

2016) ("Time spent on unsuccessful claims the court deems related are to be included in the

lodestar, while '[h]ours expended on unrelated, unsuccessful claims should not be included' to the

extent those hours can be 'isolated.'").

Although "there is no certain method of determining when claims are 'related' or

'unrelated,'" *Hensley*, 461 U.S. at 436 n. 12, claims are generally completely unrelated when they

are "'distinctly different' in all respects, both legal and factual, from plaintiff's successful claims."

*Morgan v. D.C.*, 824 F.2d 1049, 1066 (D.C. Cir. 1987). In such circumstances, no fees should

awarded for the time spent on the unsuccessful claims. *Craig v. D.C.*, 197 F. Supp. 3d 268, 283

(D.D.C. 2016). However, different claims brought in one lawsuit may be interrelated, *i.e.*, they

"involve a common core of facts" or are "based on related legal theories" and "cannot be viewed as a series of discrete claims." *Hensley*, 461 U.S. at 435.  In such cases, "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis," so "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.*  Therefore, "if successful and unsuccessful claims share a common core of facts[,] . . . a court should simply compute the appropriate fee as a function of degree of success." *Goos v. Nat'l Ass'n of Realtors*, 997 F.2d 1565, 1569 (D.C. Cir. 1993) (internal quotation marks omitted).

In addition, courts should exclude from fee calculations "hours that were not 'reasonably expended,'" *i.e.*, "excessive, redundant, or otherwise unnecessary" hours.  *Hensley*, 461 U.S. at 434.  For example, courts may reduce fee awards "for inadequate billing judgment, for hours billed unrelated or unnecessary to the litigation, for statutorily non-reimbursable time, or for double-billing." *Shaw v. D.C.*, 210 F. Supp. 3d 46, 51 (D.D.C. 2016) (internal citations omitted).  In addition, tasks that are clerical in nature, such as filing documents, setting up meetings, and faxing documents, are non-compensable.  *Beckwith v. D.C.*, No. 15-CV-1284-RCL, 2017 WL 1653148, at *3 (D.D.C. May 1, 2017).  Courts may take a "holistic approach" to reducing hours, or may "identify specific hours that should be eliminated." *McAllister v. District of Columbia*, 160 F. Supp. 3d 273, 279–80 (D.D.C. 2016).

The District argues that the requested fees should be reduced because plaintiffs improperly billed for matters in which they failed to prevail, because they billed an unreasonable number of hours for many tasks, and because they failed to exercise reasonable billing judgment.  It also

argues that fees for several individual attorneys should be reduced substantially or denied.  The Court will take each in turn.

### 2.   Analysis

#### a)   *Reductions for Lack of Success*

The District argues that plaintiffs' fees should be reduced based on lack of success due to the following unsuccessful claims: 1) the claims of Subclass 2; 2) Rehabilitation Act claims from March 22, 2010 to the present; and 3) plaintiffs' claim for individual relief.  Plaintiffs have withdrawn and hold in abeyance their request for compensation for work related to individual relief ($155,053.31 by TPM and $18,361.98 by co-counsel), thus the Court need not address this issue.

The Court first determines that the "unsuccessful" claims are so interrelated that they cannot be viewed as discrete claims for which compensation is barred.  Subclass 2 encompassed disabled three-to-five-year-olds whom the District failed to give an initial evaluation within 120 days of being referred for special education services.  Plaintiffs prevailed on the claims of Subclass 2 through April 6, 2011, but not after that.  *See* Nov. 3, 2015 Order, ECF No. 491.  The Subclass 2 claims are interrelated to the Subclass 3 claims, which encompassed disabled three-to-five-year-olds whom the District failed to give an "eligibility determination" within 120 days of being referred, and upon which plaintiffs prevailed.  As this Court explained, "the percentages of timely evaluations should be nearly identical to the eligibility determination statistics. . . .  In fact, the data may be exactly the same, since, at least for the period from 2011 to the present, the District has reported data regarding the percentage of timely eligibility determinations, but referred to that data as the percentage of timely evaluations."  *DL*, 194 F. Supp. 3d at 80–81.  Furthermore, the Rehabilitation Act claims—on which plaintiffs did not prevail from March 22, 2010 to the present—are interrelated with the IDEA claims.  As this Court previously discussed, this case is

at its heart an IDEA case.  The Rehabilitation Act provides a remedy when the defendant's IDEA violations were committed in bad faith or through gross misjudgment.  The Rehabilitation Act claims in this case rest on top of the IDEA claims.

Given the interrelatedness of the unsuccessful claims to the successful claims, the Court will consider plaintiffs' degree of success in determining whether to reduce the fee award. Plaintiffs largely prevailed on their claims.  After the issues of class certification were settled, the Court found in 2014 that "the District was liable for violating the IDEA and District law for the period up to April 6, 2011" for all four subclasses.  *DL*, 194 F. Supp. 3d at 37.  It ruled for defendants, however, "on (1) plaintiffs' IDEA and District law claims related to the failure timely to evaluate children for special education and related services for the period from April 6, 2011 to the present [Subclass 2], and (2) all of plaintiffs' Rehabilitation Act claims for the period from March 22, 2010 to the present."  *Id.*  Then, at trial, plaintiffs alleged that the District violated the IDEA with respect to Subclasses 1, 3, and 4 from April 6, 2011 through the present, and that the District violated the Rehabilitation Act with respect to all four subclasses for the period up to March 22, 2010.  *Id.* at 37–38.  After trial, the Court found that the District had violated the IDEA with respect to Subclasses 1, 3, and 4 from April 6, 2011 through the first day of trial (November 12, 2015), and that it violated the Rehabilitation Act with respect to all four subclasses through March 22, 2010.  *Id.* at 88–96.  The breakdown of each party's success is as follows:

|  | IDEA Claims through April 6, 2011 | IDEA Claims from April 6, 2011 to present | Rehabilitation Act Claims through March 22, 2010 | Rehabilitation Act Claims from March 22, 2010 to present |
|---|---|---|---|---|
| **Subclass 1** | Plaintiffs | Plaintiffs | Plaintiffs | Defendants |
| **Subclass 2** | Plaintiffs | Defendants | Plaintiffs | Defendants |
| **Subclass 3** | Plaintiffs | Plaintiffs | Plaintiffs | Defendants |
| **Subclass 4** | Plaintiffs | Plaintiffs | Plaintiffs | Defendants |

Clearly, plaintiffs prevailed on the large majority of issues presented in this case. Moreover, the Court finds that success on the IDEA claims carries more weight than success on the Rehabilitation Act claim. As has been mentioned numerous times, this was essentially an IDEA case. To prevail at all, plaintiffs needed to have prevailed on their IDEA claims. Except for the claims of Subclass 2 from April 6, 2011 to the present, they did so. Therefore, although some reduction is warranted for lack of success, it must be limited. The Court finds that a 5% reduction is appropriate. Although 5% may seem small, on a total reward of upwards of $10 million, 5% equals almost $500,000, which is a substantial sum.

The District also argues that plaintiffs' fee award should be reduced due to the following unsuccessful litigation strategies: 1) defense of defendants' appeal in 2012–2013 and 2) efforts towards settlement. The District filed an appeal after this Court denied its motion to decertify the class. It was ultimately successful on that appeal. Plaintiffs, of course, defended against the appeal as was required of them. After appeal and certification of the four subclasses, plaintiffs largely prevailed, as shown above. The Court does not find that plaintiffs should be penalized for defending an appeal they were forced to defend as a result of this Court's decision not to decertify the class, which was ultimately overturned.

The Court also finds that, absent any indication that the District had completely declined to engage in settlement efforts and plaintiffs knowingly billed for settlement time anyway, plaintiffs should be compensated for time spent on settlement efforts. The District's reliance on the *Cobell* decision is misplaced given subsequent proceedings in that case. In 2005, this Court, considering an interim award of attorney's fees, found that plaintiffs could not be compensated for unsuccessful settlement efforts up to that point. *Cobell v. Norton*, 407 F. Supp. 2d 140, 156 (D.D.C. 2005). The case did not end there, however. Many years of litigation later, the parties

reached a settlement agreement, in which they agreed not to appeal a fee award of anywhere between $50 and $99.9 million.  Joint Motion for Preliminary Approval of Settlement at 16, *Cobell v. Salazar* (D.D.C. Dec. 10, 2010) (No. 96-cv-1285), ECF No. 3660.  Judge Hogan, to whom the case was later assigned, held a fairness hearing and approved the parties' settlement, awarding fees totaling $99 million.  Order Granting Final Approval to Settlement ¶ 15, *Cobell v. Salazar*, 2011 WL 10676927, at *5 (D.D.C. July 27, 2011), ECF No. 3850.  The Court of Appeals affirmed Judge Hogan's approval of the settlement in 2012.  *Cobell v. Salazar*, 679 F.3d 909 (D.C. Cir. 2012). Given the subsequent settlement in *Cobell*, which included a fee settlement, this Court considers the portion of its earlier fee decision regarding fees for time expended on settlement efforts to have been essentially abrogated.  It does not consider itself bound by that decision and finds that plaintiffs here should be compensated for their time spent on settlement efforts.

> b)   *Reductions for Inadequate Billing Judgment and Unreasonable Number of Hours Billed*

The District argues that plaintiffs' fees should be reduced because counsel failed to exercise billing judgment and because counsel billed an unreasonable number of hours for many tasks. Specifically, the District argues that plaintiffs' invoices are excessive for the work performed, plaintiffs should not be reimbursed for block-billed tasks, plaintiffs' billing entries are impermissibly vague, plaintiffs over-lawyered tasks, and plaintiffs improperly billed for clerical tasks.  The Court will address each argument, but takes into consideration the Supreme Court's instruction that "[t]he essential goal in shifting fees is to do rough justice, not to achieve auditing perfection."  *Fox v. Vice*, 563 U.S. 826, 838 (2011).

The Court first considers the closely related issues of billing judgment and the reasonableness of the number of hours expended.  Plaintiffs' counsel has already eliminated approximately 10% of their fees, totaling approximately $1.1 million, in the exercise of billing

judgment. Some of this time was excluded from plaintiffs' initial fee petition, some was excluded as a result of the District's opposition to plaintiffs' 2012 petition, and some was excluded as a result of the District's opposition to the instant motion. TPM eliminated $67,989.07[2] for time marked as "No Charge" from Period 1; $63,710.24 in response to the District's opposition to plaintiffs' 2012 fee application; $1,599.74 in additional reductions made prior to the filing of plaintiffs' instant motion; $40,001.04 related to fees which TPM requested in 2012 in relation to Plaintiffs' Motion to Compel Discovery; $128,037.68 in fees marked as "No Charge" during Period 2; and $361,391.49 in additional reductions made with regard to Period 2 prior to the filing of plaintiffs' instant motion. *See* Terris Aff. ¶¶ 31–33, 68–70, Pls.' Ex. 1, ECF No. 537-1. Professor Gutman has excluded half of the time spent by his students on this case (228.875 out of 457.75 hours expended; 6.625 hours out of 13 hours and 15 minutes expended; 59.75 hours out of 119.5 hours expended; and 1.5 hours out of 3 hours expended), as well as 4.5 hours (from 72.5) on work he conducted in 2005 and 2006. Gutman Aff. ¶¶ 10, 16, 17, 21, 23, Pls.' Ex. 14, ECF No. 537-15. Ms. Kohn has deducted 21.33 hours (from a total of 364.77) from her Period 1 time and 18.7 hours (from a total of 151.80) from her Period 2 time. Kohn Aff. ¶¶ 24, 36, Pls.' Ex. 16, ECF No. 537-16. Mr. Mehri also excluded several hours of his time and his paralegal's time. Mehri Aff. ¶ 13, Pls.' Ex. 17, ECF No. 537-17.

In their reply brief, plaintiffs' counsel excludes additional time from their fee petition. TPM has deducted an additional $346.32 in costs for Period 1 and $231,760.13 in fees from Period 2. Revised Summary of Fees and Expenses, Pls.' Ex. 4, ECF No. 566-1; Plaintiffs' Summary of Additional Reductions of Time and Expenses with Reply Brief, Pls.' Ex. 102, ECF No. 566-35. Professor Gutman has deducted an additional $4,749.50 in fees for Period 2. *Id.* Ms. Kohn has

---

[2] This figure was calculated using plaintiffs' proffered rates under the LSI Matrix.

deducted an additional $13,612.48 in fees from Period 2. *Id.* In sum, plaintiffs originally sought $10,010,956 *after* excluding $828,702.81 of their fees and expenses in the exercise of billing judgment. They now seek $9,760,487.55 after further exclusions made in response to the District's opposition, totaling $250,468.45. Given plaintiffs' already performed diligence in excluding approximately 10% of the fees and expenses incurred in this case in the exercise of billing judgment and in an effort to exclude time unreasonably billed, the Court finds that no further reduction is warranted.

The Court next finds that plaintiffs billing entries are not vague or block billed. While plaintiffs' billing entries do list separate tasks within one entry, plaintiffs' time records are divided into categories and subcategories that relate to the work performed. For example, the categories include descriptions such as "complaint," "plaintiffs' motion for certification," "plaintiffs' initial disclosures," and "defendant's motion to dismiss." The subcategories include descriptors such as "drafting complaint," "plaintiffs' initial brief," and "plaintiffs' opposition brief." When these categories and subcategories are taken into consideration, plaintiffs' entries are not vague. Nor do they run afoul of the rule against block billing—which exists because block billing makes it impossible to determine how much time within a block is non-compensable if the block contains certain non-compensable tasks, *see Bennett v. Castro*, 74 F. Supp. 3d 382, 405 (D.D.C. 2014)— because the division into categories and subcategories sufficiently shows whether the entire entry is compensable.

The District's argument that plaintiffs' award should be reduced due to over-lawyering— double billing for tasks—also fails. It appears to the Court that the District is simply speculating that unnecessary double billing occurred for the exact same task. It is not unusual, particularly in a large class action such as this, for lawyers to work on teams where multiple members collaborate

on tasks and attend the same meetings.  The District has not identified circumstances in which multiple members of the plaintiffs' counsel's team billed for the exact same task.  *Cf. Role Models Am., Inc. v. Brownlee*, 353 F.3d 962, 972 (D.C. Cir. 2004) (describing improper double billing when two individuals billed time for filing the same brief on three occasions).

Finally, the District argues that plaintiffs improperly billed for clerical tasks, such as assembling invoices, downloading document productions, and maintaining and storing electronically filed documents.  The District has identified much of, but not all of, the work it feels is clerical.  From Period 1, it identifies 169.434 hours of time billed under the category of Document/Database Management, 13.07 hours of making copies, and .20 hours related to scanning.  From Period 2, the District identifies 20.57 specific hours related to assembling invoices, downloaded document productions, and document/database management. It also argues that "[p]laintiffs include 'case management' as a billable category, when the work consists of nothing more than maintaining and sorting electronically filed documents."  Defs.' Opp'n at 36.  Plaintiffs do include a category called "Case Administration," which costs of the subcategory "ECF Management" in which the description of work is "process ECF filings," and the subcategory "Document/Database Management" in which the description of work includes "process ECF filings" as well as various other tasks.  Plaintiffs argue that all of this work was compensable paralegal work.

The Court finds that these entries constitute a mixed bag of compensable and non-compensable work.  On the one hand, work such as document and database management has been considered compensable paralegal work.  *See Salazar v. D.C.*, 991 F. Supp. 2d 39, 55 (D.D.C. 2014).  On the other, tasks such as copying and scanning are traditionally considered non-compensable clerical work.  *See Jackson v. D.C.*, 603 F. Supp. 2d 92, 98 (D.D.C. 2009), *amended*

*in part*, 696 F. Supp. 2d 97 (D.D.C. 2010). Therefore, of the 203.27 hours of work performed by paralegals specifically identified by the District, the Court finds that 50%—or 101.64 hours—are not compensable.

> c)   *Reductions for Specific Counsel*

The District argues that the fee requests of TPM's co-counsel—Margaret Kohn, Jeffrey Gutman, and Cyrus Mehri—should be substantially reduced or denied. With respect to Ms. Kohn, it argues that she billed for matters unrelated to this case—specifically for work related to the *Blackman-Jones* lawsuit—and her additional time was cumulative and unreasonable. The Court first finds that the *Blackman-Jones* argument fails because, as Ms. Kohn testified in her affidavit, she gathered information related to the *Blackman-Jones* case to assist plaintiffs in this case; she was not billing for work performed on that case. *See* Kohn Aff. ¶¶ 19, 34. In addition, there is no evidence that Ms. Kohn's contributions were cumulative or unnecessary. According to her affidavit, Ms. Kohn has expertise and extensive experience in special education law, including in the context of class actions. *See* Kohn Aff. 1–8. Bruce Terris, lead counsel for plaintiffs, also testified that "[h]er extensive knowledge of special education law and the Child Find operations, policies, and practices of the District enabled her to provide essential contributions as class counsel." Terris Aff. ¶ 11(b). Finally, the reductions made by Ms. Kohn to her own time are sufficient to remedy any unreasonable hours billed. Ms. Kohn seeks $283,681.44 for Period 1, after a $17,618.58 reduction. *See* Revised Summary of Fees and Expenses. For Period 2, she seeks $96,328.12, after a reduction of $29,058.68. *Id.* Beyond any aforementioned across the board reductions, Ms. Kohn's fees shall not be further reduced.

The District argues that all of the fees billed by Professor Gutman should be denied because "[n]o justification exists for awarding work done by law students more than a decade ago—for which they received school credit, not to mention practical legal experience," the time entries are

32

deficiently vague, and Professor Gutman and his students billed in 15 minute increments thereby inflating the bills. Defs.' Opp'n at 43–44. First, there is simply no reason to reduce these fees because the work was performed many years ago. The purpose of fee-shifting statutes is to compensate for the work performed, regardless of when it occurred. In addition, it is established that law students may be awarded fees at paralegal rates. *See Covington*, 57 F.3d at 1105–07; *Blackman*, 677 F. Supp. 2d at 175. Finally, the reductions already made by Professor Gutman are sufficient to remedy any vagueness or issues with 15 minute billing. As explained above, Professor Gutman cut in half all of the hours expended by his students in his fee petition. He further reduced the originally sought $5,988.50 for Period 2 by $4,749.50. *See* Revised Summary of Fees and Expenses. The 50% reduction and further exclusion of $4,749.50 are sufficient and Professor Gutman's fees shall not be further reduced.

Finally, the District argues that Mr. Mehri's fees should be denied because his participation in this case consisted of advising on class certification and settlement, but plaintiffs lost on class certification and failed to settle. As the Court has already found that plaintiffs are entitled to fees despite losing the class certification question on appeal and failing to reach a settlement agreement, the District's argument with respect to Mr. Mehri is without merit and he is entitled to the fees sought.

### D.    *Reasonableness of Costs*

The District argues that plaintiffs' costs are excessive and should be reduced significantly. Specifically, the District argues that ground transportation (via taxi), overnight delivery, overtime services, telephone charges, and Westlaw and Lexis fees are not reimbursable. The Court rejects these arguments in part. "Reasonable photocopying, postage, *long distance telephone*, messenger, and *transportation* and parking costs are customarily considered part of a reasonable 'attorney's

33

fee.'" *Sexcius v. D.C.*, 839 F. Supp. 919, 927 (D.D.C. 1993) (emphasis added). The costs of legal research are also reimbursable under fee shifting statutes. *See Role Models Am.*, 353 F.3d at 975 ("The government urges us to deny any recovery for computer-research charges, but we decline to do so because such services presumably save money by making legal research more efficient"); *Salazar*, 991 F. Supp. 2d at 64 ("Reimbursement under section 1988 for Westlaw and Lexis fees incurred for 'computer-assisted legal research' is standard in this Circuit."). Therefore, the District shall reimburse plaintiffs for their travel expenses, telephone charges, and Westlaw and Lexis charges. Because plaintiffs make no argument with respect to expenses incurred for overnight delivery ($10,274.44) or overtime services ($284.24), the Court will not award them reimbursement for these costs.

The District also argues that the expenses sought for printing— $36,000—are excessive. Given that much of the material in this case was kept in electronic format, the Court finds that it is not appropriate to shift the entire cost of printing when the reason for printing is at least partially simple preference for hard copy. *See* Gluckman Aff. ¶ 80. The printing expenses shall be reduced by 50%.

### E.     Expert Fees

The final disagreement in this case centers around reimbursement for expert fees. Plaintiffs agree that they cannot recover expert fees under the IDEA. Instead, they seek $121,207.82 for expenses incurred by their two experts during Period I under the Rehabilitation Act. As both parties acknowledge, there is a split of authority in district courts regarding whether plaintiffs may recover expert fees under the Rehabilitation Act. *Compare M.M. v. School District of Philadelphia*, 142 F. Supp. 3d 396, 413 (E.D. Pa. 2015) (holding that expert fees are recoverable in Rehabilitation Act cases), *and K.N. v. Passaic City Board of Education*, No. 11-399, 2011 WL

5157280, at *15 (D.N.J. 2011) (same), *with M.P. ex rel. Independent School District*, No. 01-771, 2007 WL 844688, at *4 (D. Minn. 2007) (finding that expert fees are not recoverable under the Rehabilitation Act), *and Mason v. Maine Dept. of Corrections*, 387 F. Supp. 2d 57, 64 (D. Me. 2005) (same). Absent clear statutory command or direction from the D.C. Circuit—or any Circuit Court—the Court agrees with those courts that have held that expert fees are recoverable under the Rehabilitation Act.

Although this Court has mentioned several times that the importance of the IDEA claims in this case and the fact that the Rehabilitation Act claims do not exist independently, it is not true that the Rehabilitation Act added nothing of substance to this case. Plaintiffs had to meet a greater burden to prove their Rehabilitation Act claims—bad faith or gross misjudgment. If the Rehabilitation Act claims added nothing to this case, there would have been no reason for them to proceed all the way through trial. The Court concludes that plaintiffs are entitled to $121,207.82 for expert fees.

## V. CONCLUSION

Plaintiffs' motion for attorneys' fees and costs shall be granted in part and denied in part. The IDEA fee caps do not apply in this case. Fees shall be calculated according to the lodestar method of multiplying the number of hours reasonably expended by reasonable hourly rates. Hourly rates shall be determined by current USAO Matrix rates. Plaintiffs shall multiple these rates by the number of hours billed for each timekeeper—after all of the aforementioned voluntary reductions—less the 101.64 hours the Court has identified as non-compensable clerical work billed by paralegals. After this calculation, plaintiffs' fee award shall be reduced by 5% for lack of success. It shall not be further reduced for issues such as lack of billing judgment, unreasonable number of hours, block billing, or vagueness. The fee awards for Margaret Kohn, Jeffrey Gutman,

and Cyrus Mehri shall also not be reduced any further. Plaintiffs are also entitled to reasonable costs. They shall be reimbursed for travel, telephone, and Westlaw/Lexis expenses, but shall not be reimbursed for overnight delivery of overtime services. They shall be reimbursed 50% of their printing costs. Finally, plaintiffs are entitled to $121,207.82 in expert fees.

Given the number of attorneys and paralegals in this case with different billing rates, the voluminous number of hours, and various reductions to those hours, both voluntary and involuntary, the Court will not at this time calculate the total fee award. Instead, in order to ensure that the correct calculations are performed in accordance with this Memorandum Opinion, the Court will order plaintiffs to submit new fee and cost award calculations in accordance with the aforementioned findings. Plaintiffs shall calculate the fees due under the current USAO Matrix, and shall then reduce those fees by 5%. Plaintiffs shall also calculate their costs for travel, telephone, and Westlaw/Lexis expenses, as well as 50% of their printing expenses. The Court will review plaintiffs' submission, and will allow the District to respond, before ordering the District to reimburse plaintiffs the requested amount.

A separate Order accompanies this Memorandum Opinion.

Date: August 25, 2017

Royce C. Lamberth
United States District Judge