## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

RICA GATORE, <u>et al.</u>,

          Plaintiffs,

          v.

UNITED STATES DEPARMENT
OF HOMELAND SECURITY,

          Defendant.
_____

Civil Action No. 15-459 (RBW)

### MEMORANDUM OPINION

Catholic Charities and eight individual plaintiffs brought this civil action against the

defendant, the United States Department of Homeland Security, under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552 (2012), seeking, <u>inter alia</u>, documents relating to the

defendant's processing of FOIA requests for the assessments of asylum officers.  <u>See</u> Amended

Complaint ("Am. Compl.") ¶¶ 1–4, 61.  Currently pending before the Court is Catholic

Charities' Renewed Motion for Summary Judgment as to Ninth Cause of Action ("Pl.'s Renewed

Summ. J. Mot."), which actually seeks an award of attorney's fees and costs because Catholic

Charities was awarded summary judgment on its ninth cause of action.  Upon careful

consideration of the parties' submissions,[1] the Court concludes for the reasons set forth below

that it must grant Catholic Charities' motion.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment ("Pl.'s Mem."); (2) the Defendant's Response to the Court's Order to Show Cause Regarding Attorney's Fees ("Def.'s Resp."); (3) Plaintiff Catholic Charities' Reply to [Defendant's] Response Regarding Order to Show Cause ("Pl.'s Reply"); (4) the Defendant's Notice of Supplemental Authority ("Def.'s Notice"); (5) the Plaintiff's Motion for Summary Judgment as to Ninth Cause of Action ("Pl.'s Summ. J. Mot."); and (6) the Defendant's Motion for Summary Judgment, Opposition to Plaintiff's Motion to Certify Class, and Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def.'s Summ. J. Mot.").

## I.   BACKGROUND

The Court's opinions and prior orders set forth in detail the factual and procedural history of this case, and therefore, the Court finds it unnecessary to reiterate that history here.  However, the following summary is relevant to Catholic Charities' present request for attorney's fees and costs.  On February 13, 2015, Catholic Charities submitted a FOIA request to the defendant seeking "[d]ocuments relating to the processing, answering, and responding to FOIA requests for assessments of asylum officers."  Am. Compl., Exhibit ("Ex.") 9 (Catholic Charities' FOIA Request).[2]  On February 18, 2015, the defendant requested additional time to process the request, citing "unusual circumstances."  See Def.'s Summ. J. Mot., Ex. 1 (Declaration of Jill A. Eggleston (July 21, 2015)), Ex. H (Letter from Jill A. Eggleston, Director, FOIA Operations, U.S. Citizenship and Immigration Servs., to David L. Cleveland, Catholic Charities of Washington (Feb. 18, 2015)) at 1.  The plaintiffs' amended complaint alleged as its ninth cause of action that the "[d]efendant . . . provided nothing in response" to Catholic Charities' FOIA request.  Am. Compl. ¶¶ 61–62.

On June 24, 2015, still having received no documents in response to its request, Catholic Charities filed a motion for summary judgment as to its ninth cause of action.  See Pl.'s Summ. J. Mot. at 1.  Thereafter, in October 2015, the defendant produced three documents in response to Catholic Charities' FOIA request.  Pl.'s Mem. at 3; Def.'s Resp. at 6.  Although the Court found "that the defendant's delay in processing Catholic Charities' FOIA request appear[ed] to be unjustified," the Court denied Catholic Charities' summary judgment motion because Catholic Charities "failed to address this Circuit's standard for the award of costs and attorney fees under

---

[2] Catholic Charities alleges that it submitted its request on February 12, 2015, see Am. Compl. ¶ 61, but the date noted on the actual request is February 13, 2015, see id., Ex. 9 (Catholic Charities' FOIA Request).

the FOIA." Gatore v. U.S. Dep't of Homeland Sec., 177 F. Supp. 3d 46, 54–55 (D.D.C. 2016) (Walton, J.).

On May 27, 2016, the defendant filed a supplemental Vaughn index, which referenced a "FOIA Processing Guide" (the "Guide"). See Notice of Supplemental/Revised Vaughn Index, Ex. 1 (Supplemental Declaration of Jill A. Eggleston (May 27, 2016)) ¶¶ 8–10. In response, Catholic Charities filed its Renewed Motion for Summary Judgment as to Ninth Cause of Action, in which it argued that the Guide fell within the scope of its FOIA request and requested that the Guide be produced to it within ten days. See Pl.'s Renewed Summ. J. Mot. at 4. The motion further requested that the Court order the defendant to pay Catholic Charities "attorney['s] fees of $13,643 and costs of $400." Id. at 10. The defendant did not respond to Catholic Charities' motion.

On February 3, 2017, the Court partially granted Catholic Charities' renewed summary judgment motion and ordered the defendant to produce the Guide to Catholic Charities within ten days as requested. See Order at 9 (Feb. 3, 2017), ECF No. 58 (the "February 3, 2017 Order"). Although the Court additionally "conclud[ed] that Catholic Charities [wa]s both eligible for and entitled to an award of attorney's fees and costs," id. at 6, in light of the defendant's failure to respond to Catholic Charities' motion, the Court ultimately found it appropriate to "give the defendant an opportunity to submit a response . . . to the amount sought, to ensure that this issue is fully briefed prior to its resolution," id. at 8. Accordingly, the Court ordered the defendant to "show cause . . . why the Court should not award the amount of attorney's fees and costs requested by Catholic Charities." Id. at 9.

On February 14, 2017, the defendant filed a motion for reconsideration of the Court's February 3, 2017 Order. See generally Defendant's Motion to Reconsider & Stay, or

Alternatively, to Modify the February 3, 2017[] Order and Memorandum in Support (Feb. 14, 2017).  On June 27, 2017, the Court denied the defendant's motion for reconsideration, and again ordered the defendant to produce the Guide within ten days and show cause why Catholic Charities should not be awarded the amount of attorney's fees and costs requested.  See Order at 6 (June 27, 2017), ECF No. 79.  On July 21, 2017, over two years after Catholic Charities made its FOIA request pursuant to its ninth cause of action, the defendant produced the Guide to Catholic Charities.  See Pl.'s Reply at 2.

## II.    STANDARD OF REVIEW

The FOIA provides that courts "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the [plaintiff] has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).  "This language naturally divides the attorney-fee inquiry into two prongs, which [District of Columbia Circuit] case law has long described as fee 'eligibility' and fee 'entitlement.'"  Brayton v. Office of the U.S. Trade Rep., 641 F.3d 521, 524 (D.C. Cir. 2011) (quoting Judicial Watch, Inc. v. U.S. Dep't of Commerce, 470 F.3d 363, 368–69 (D.C. Cir. 2006)).  "The eligibility prong asks whether a plaintiff has 'substantially prevailed' and thus 'may' receive fees."  Id.  "If so, the court proceeds to the entitlement prong and considers a variety of factors to determine whether the plaintiff should receive fees."  Id.  (quoting Judicial Watch, 470 F.3d at 369).  "Finally, '[a] plaintiff who has proven both eligibility for and entitlement to fees must submit [its] fee bill to the court for [its] scrutiny of the reasonableness of (a) the number of hours expended and (b) the hourly fee claimed.'"  Judicial Watch, 470 F.3d at 369 (quoting Long v. IRS, 932 F.2d 1309, 1313–14 (9th Cir. 1991)).

4

## III.   ANALYSIS

### A.   Eligibility for and Entitlement to Attorney's Fees and Costs

As referenced above, this Court previously concluded that Catholic Charities is eligible for and entitled to attorney's fees and costs based on its ninth cause of action. See February 3, 2017 Order at 6 ("In light of the Court's conclusion that the . . . Guide must be furnished to Catholic Charities, it is beyond debate that Catholic Charities has substantially prevailed in this litigation, and consequently, it is eligible for attorney's fees." (citation omitted)); id. at 6–7 (finding that each of the four entitlement factors weigh in favor of Catholic Charities and concluding that "Catholic Charities is . . . entitled to an award of attorney's fees and costs"). The defendant concedes that "Catholic Charities prevailed on its ninth cause of action and . . . is eligible for attorney's fees on that discrete issue," Def.'s Resp. at 6, and therefore, the Court need not reconsider its previous conclusion as to eligibility. The defendant disputes, however, that Catholic Charities is entitled to any amount of fees, arguing that all four entitlement factors weigh in its favor because the Guide "is of no public value," "Catholic Charities' request [for the Guide] was for private advantage and not for public informational purposes," and the defendant "was not unreasonable in not releasing the full . . . Guide to Catholic Charities." Id. at 4–6.[3] The

---

[3] The defendant also argues that Catholic Charities "does not even attempt to contend that its request for the . . . Guide entitles it to fees, and instead relies upon the individual [p]laintiffs' requests for records about their asylum proceedings." Def.'s Resp. at 5 (citing Pl.'s Mem. at 8–9). The Court disagrees, however, because Catholic Charities does indeed argue that it is "entitled to recover fees and costs" as a result of prevailing on its ninth cause of action. See Pl.'s Mem. at 6–10 (addressing each of the entitlement factors). Although Catholic Charities relies on cases in which courts awarded individual asylum applicants attorney's fees and costs for prevailing on their requests for records about their asylum proceedings, see id. at 8, that reliance does not preclude Catholic Charities from also recovering its attorney's fees and costs resulting from its successful effort to obtain the Guide.

Court disagrees, and will again conclude that Catholic Charities is entitled to some amount of attorney's fees and costs.

In assessing whether a plaintiff is entitled to attorney's fees, the Court typically considers four factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents." McKinley v. Fed. Hous. Fin. Agency, 739 F.3d 707, 711 (D.C. Cir. 2014) (quoting Tax Analysts v. U.S. Dep't of Justice, 965 F.2d 1092, 1093 (D.C. Cir. 1992)). As to the first factor, which requires the Court to consider both "the effect of the litigation for which fees are requested and the potential public value of the information sought," Davy v. CIA, 550 F.3d 1155, 1159 (D.C. Cir. 2008) (quoting Tax Analysts, 965 F.2d at 1093), the defendant argues that the Guide "is of no public value," see Def.'s Resp. at 4–5, citing as support for this position a decision in which the District of Columbia Circuit concluded that documents relating to the Smithsonian's museum shops had no potential public value because "no evidence exist[ed] that the release of the . . . documents w[ould] contribute to the public's ability to make vital political choices," and the plaintiff "sought these documents for the sole purpose of facilitating her employment discrimination suit," Cotton v. Heyman, 63 F.3d 1115, 1120 (D.C. Cir. 1995). The documents here, however, do not compare with the documents in Cotton. Unlike the documents requested in Cotton, the defendant's Guide has significant potential public value because it "will enable citizens to more effectively and knowledgeably use FOIA to obtain information [from the defendant] to which they are entitled." See Negley v. FBI, 818 F. Supp. 2d 69, 76 (D.D.C. 2011) (concluding that "the public ha[d] derived great benefit" from the plaintiff's FOIA litigation because it "produced 'extraordinary information regarding how the FBI maintains its records and the baseline method by which it will search for and

respond to FOIA requests'"). Access to such information is especially important for organizations like Catholic Charities and their clients given that the "FOIA is the exclusive means that a respondent in Immigration Court proceedings must use to obtain documents for use in immigration proceedings." Jarno v. Dep't of Homeland Sec., 365 F. Supp. 2d 733, 739 (E.D. Va. 2005) (citing 8 C.F.R. § 1208.12 (2005)). Moreover, the defendant's argument fails to address the "effect of this litigation," which is a component of the public benefit analysis. See Davy, 550 F.3d at 1159. This factor weighs in favor of Catholic Charities, because the defendant "did not turn over any documents to [Catholic Charities] until after [it] filed suit," making the defendant's release of the Guide a "fruit of [Catholic Charities'] litigation." See id. Thus, the Court again concludes that the first entitlement factor weighs in Catholic Charities' favor.

As to the second and third factors, which concern the "commercial benefit to the plaintiff" and "the nature of the plaintiff's interest in the records," McKinley, 739 F.3d at 711 (quoting Tax Analysts, 965 F.2d at 1093), the defendant argues that Catholic Charities "sought [the Guide] specifically for use in this litigation," and its request therefore "was for private advantage and not for public informational purposes," Def.'s Resp. at 4–5. However, as the Court previously found, Catholic Charities' objective in seeking the Guide and other documents was, inter alia, "to promote the fairness and integrity of this country's asylum process." February 3, 2017 Order at 7. And the mere fact that Catholic Charities has cited the Guide's content in litigating its remaining claims in this suit, see Def.'s Resp. at 8, without more, does not "transform [this] nonprofit['s] interests from [a] public interest to [a] commercial or self-interest," see Elec. Privacy Info. Ctr. ("EPIC") v. U.S. Dep't of Homeland Sec., 218 F. Supp. 3d 27, 45 (D.D.C. 2016) (rejecting the defendant's argument that the plaintiff's distribution of information it had obtained in a newsletter that featured a link for donations demonstrated that

the plaintiff's interest in the information was commercial or private and not public).  Moreover,

the Circuit's decision in Cotton does not counsel the Court to conclude otherwise, because in that

case, the Circuit was left with no choice but to conclude that the plaintiff sought the documents

for her own self-interest, given its conclusion that the documents requested by the plaintiff

wholly lacked public value.  See 63 F.3d at 1120.  The defendant thus "provides no basis to

doubt that [Catholic Charities'] purpose in filing the FOIA request and pursuing litigation was to

increase the public fund of knowledge about a matter of public concern."  Davy, 550 F.3d at

1162; see also EPIC, 218 F. Supp. 3d at 45 ("[N]onprofit public interest group[s] are usually

allow[ed] recovery of fees . . . ."  (second and third alterations in original) (quoting All. for

Responsible CFC Policy, Inc. v. Costle, 631 F. Supp. 1469, 1471 (D.D.C. 1986))).

   Finally, regarding the fourth factor, which concerns "whether the [defendant's]

opposition to disclosure 'had a reasonable basis in law' and whether the [defendant] 'had not

been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior,'"

Davy, 550 F.3d at 1162 (first quoting Tax Analysts, 965 F.2d at 1096, then quoting LaSalle

Extension Univ. v. FTC, 627 F.2d 481, 486 (D.C. Cir. 1980)), the defendant argues that it "was

not unreasonable in not releasing the full . . . Guide to Catholic Charities" because "Catholic

Charities limited its FOIA request to documents about 'processing, answering, and responding to

FOIA requests for assessments of [an] asylum officer,' so [the d]efendant released only the

sections of its . . . Guide related to that specified subject matter," Def.'s Resp. at 5.  However,

this was not a "reasonable basis in the law" for the defendant's failure to disclose the entire

Guide, as this Court's prior rulings make clear, see June 27, 2017 Order at 6 ("The Court finds

that the Department's selective release of only a portion of the . . . Guide it deemed responsive to

Catholic Charities' request, and its failure to explain why the other portions are exempted from

disclosure, do not square with the Circuit's instruction that the FOIA's statutory scheme does not permit an agency to fail to disclose purportedly non-responsive information from a record deemed responsive, unless that information is subject to a statutory exemption." (citations omitted)).  In addition, the defendant offers no evidence to show that it had a reasonable basis for not disclosing <u>any</u> part of the Guide until after Catholic Charities filed suit.  <u>See Davy</u>, 550 F.3d at 1163; <u>see also</u> <u>EPIC</u>, 218 F. Supp. 3d at 46 ("[A]n agency lacks a colorable basis in the law where it does not [substantively] respond to a FOIA request until after a lawsuit has been filed." (citing <u>Davy</u>, 550 F.3d at 1163)).  Furthermore, the defendant has certainly been recalcitrant in refusing for over two years to produce the Guide, which "falls squarely within the scope of Catholic Charities' FOIA request."  <u>See</u> June 27, 2017 Order at 4; <u>see also</u> February 3, 2017 Order at 7–8 ("[I]n light of the fact that it defies logic that a document titled 'FOIA Processing Guide' does not fall squarely within the scope of Catholic Charities' FOIA request, the Court must conclude that the defendant's inaction amounts to recalcitrance in regards to its obligations under the FOIA.").  Thus, the Court again finds that all four entitlement factors weigh in favor of Catholic Charities, and as a result, Catholic Charities is entitled to some amount of attorney's fees and costs.

### B.   Reasonableness of Attorney's Fees and Costs

Having found that Catholic Charities is both eligible for and entitled to attorney's fees and costs, the Court must next assess the reasonableness of the fees and costs requested, as the FOIA permits an award of "<u>reasonable</u> attorney fees and other litigation costs."  5 U.S.C. § 552(a)(4)(E)(i) (emphasis added).  "The usual method of calculating reasonable attorney's fees is to multiply the hours reasonably expended in the litigation by a reasonable hourly fee, producing the 'lodestar' amount."  <u>Bd. of Trs. of Hotel & Rest. Emps. Local 25 v. JPR, Inc.</u>, 136

F.3d 794, 801 (D.C. Cir. 1998).  The party seeking fees and costs bears the burden of showing

the reasonableness of its fees and costs requests.[4]  Role Models Am., Inc. v. Brownlee, 353 F.3d

962, 970 (D.C. Cir. 2004).  Once the plaintiff has met this burden, the burden shifts to the

defendant to rebut the presumption of reasonableness with "equally specific countervailing

evidence."  Covington v. District of Columbia, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (quoting

Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1326 (D.C. Cir. 1982)); see

also Judicial Watch v. U.S. Dep't of Justice, 774 F. Supp. 2d 225, 232 (D.D.C. 2011).  Finally,

the Court may, in its discretion, adjust the amount based on other relevant factors.  See Weisberg

v. U.S. Dep't of Justice, 745 F.2d 1476, 1499–500 (D.C. Cir. 1984); see also Fenster v. Brown,

617 F.2d 740, 742 (D.C. Cir. 1979) (recognizing a court's considerable discretion in awarding

attorney's fees and costs).

### 1. Reasonableness of the Rate

To show that its requested hourly rate is reasonable, a plaintiff must submit evidence to

show "(1) 'the attorney['s] billing practices'; (2) 'the attorney['s] skills, experience, and

reputation'; and (3) 'the prevailing market rates in the relevant community.'"  Salazar ex rel.

Salazar v. District of Columbia, 809 F.3d 58, 62 (D.C. Cir. 2015) (quoting Covington, 57 F.3d at

1107).  As to the first element, because Catholic Charities' attorney is a "full-time volunteer" at a

nonprofit organization, see Pl.'s Mem., Ex. A (Declaration of David Cleveland (June 6, 2016)

---

[4] Catholic Charities argues that it "does not have th[e] burden" of showing that the rates it seeks are reasonable because the Court's February 3, 2017 Order served as "an intentional reversal of the burden of proof" and thus, "the burden is on [the defendant]."  Pl.'s Reply at 3 (citing Cheeks v. Fort Meyer Constr. Corp., 216 F. Supp. 3d 146, 169 (D.D.C. 2016)).  The Court disagrees.  The Court's February 3, 2017 Order did not shift Catholic Charities' burden, but rather, merely provided the defendant "an opportunity to submit a response, if it cho[se], to the amount of [attorney's fees Catholic Charities] sought, to ensure that this issue [wa]s fully briefed prior to its resolution."  February 3, 2017 Order at 8.  In any event, Catholic Charities' reliance on Cheeks is perplexing, given that the court in that case rejected the plaintiffs' request for a show cause order "revers[ing] the burden of proof" as "absurd."  216 F. Supp. 3d at 169 (rejecting the plaintiffs' request that the court order the defendants in a RICO case "to show cause as to why a RICO entity should not be found to exist," made "before the [c]ourt ha[d] even determined whether [the] plaintiffs may proceed on the basis of their pleadings").

("Cleveland Decl.")) ¶ 6, he presumably has no relevant billing practices.  However, this element

is not determinative because, as the Circuit instructs, attorneys at nonprofit organizations "who

have no established billing practice" are "entitled to an award based on the prevailing market

rates." Covington, 57 F.3d at 1107; see also Blum v. Stenson, 465 U.S. 886, 895 (1984)

("Reasonable fees . . . are to be calculated according to the prevailing market rates in the relevant

community, regardless of whether [the] plaintiff is represented by private or nonprofit counsel."

(internal quotation marks omitted)).  As to the second element, Catholic Charities has submitted

a declaration from its attorney representing that he has practiced as an attorney for over forty

years and litigated a number of cases, including four FOIA cases in this Court.  See id., Ex. A

(Cleveland Decl.) ¶¶ 2–9.  Based on these representations, which the defendant does not dispute,

see generally Def.'s Mem., the Court concludes that Catholic Charities has satisfied its burden as

to this element also.  Therefore, the Court turns to the evidence submitted by the parties

regarding the applicable prevailing rate.

To demonstrate the prevailing market rate, "a fee applicant must 'produce satisfactory

evidence—in addition to the attorney's own affidavits—that the requested rates are in line with

those prevailing in the community for similar services by lawyers of reasonably comparable

skill, experience and reputation.'" Eley v. District of Columbia, 793 F.3d 97, 100 (D.C. Cir.

2015) (quoting Blum, 465 U.S. at 895 n.11); see also Nat'l Ass'n of Concerned Veterans, 675

F.2d at 1325 ("An applicant is required to provide specific evidence of the prevailing community

rate for the type of work for which he seeks an award.").  As this Court has observed,

"[a]scertaining the prevailing market rate is 'inherently difficult.'" Taylor v. District of

Columbia, 205 F. Supp. 3d 75, 83–84 (D.D.C. 2016) (Walton, J.) (quoting Eley, 793 F.3d at

100).  "Nonetheless, the court must determine 'the prevailing hourly rate in each particular case

with a fair degree of accuracy.'" Id. at 84 (quoting Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1325).

Fee applicants may "submit attorney['s] fee matrices as one type of evidence that 'provide[s] a useful starting point' in calculating the prevailing market rate." Eley, 793 F.3d at 100 (second alteration in original) (quoting Covington, 57 F.3d at 1109). "For public-interest or government lawyers who do not have customary billing rates, courts in this [C]ircuit have frequently employed the 'Laffey Matrix,' a schedule of fees based on years of attorney experience that was developed in Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354 (D.D.C. 1983), rev'd on other grounds, 746 F.2d 4 (D.C. Cir. 1984)," Judicial Watch, 774 F. Supp. 2d at 232, which "established . . . [a fee] schedule for lawyers who practice 'complex federal litigation,'" Eley, 793 F.3d at 100. To account for inflation, "competing updated Laffey Matrices have [been] developed[.]" See id. at 101. Two of these updated versions are relevant here. The first version, which is maintained and updated by the United States Attorney's Office ("USAO") for the District of Columbia (the "USAO Matrix"), "begins with 2011 average hourly attorney rates in the Washington, D[.]C[.] area, . . . derived from ALM Legal Intelligence's 2011 Survey of Law Firm Economics" (the "2011 ALM survey"), and is "adjusted for inflation using a Producer Price Index ('PPI') published by the [Bureau of Labor Statistics]" that "tracks pricing changes in output of Offices of Lawyers ('PPI-OL')." See Def.'s Resp., Ex. 1 (Declaration of Dr. Laura A. Malowane, Clemente v. Fed. Bureau of Investigation, Civ. Action No. 08-1252 (D.D.C. July 6, 2016) ("Malowane Decl.")) ¶¶ 9–10; see also id., Ex. 3 (USAO Attorney's Fees Matrix: 2015–2017).[5] The second version, known as the LSI Laffey Matrix, begins with "the

---

[5] The USAO Matrix, which became effective June 1, 2015, replaced a prior version known as the USAO Laffey Matrix, which "starts with '[t]he hourly rates approved in Laffey . . . for work done principally in 1981–82' as its

(continued . . . )

base rates . . . provided by a 1989 declaration submitted by attorney Joseph Yablonski for use in

Save Our Cumberland Mountains v. Hodel, 857 F.2d 1516 (D.C. Cir. 1988) (en banc)," DL v.

District of Columbia, __ F. Supp. 3d __, __, No. 05-cv-1437 (RCL), 2017 WL 3705067, at *8

(D.D.C. Aug. 25, 2017), and then uses "the Legal Services Index of the Bureau of Labor

Statistics to adjust for inflation," Eley, 793 F.3d at 101.

Because fee matrices are "somewhat crude," Covington, 57 F.3d at 1109 ("[T]he Laffey

matrix, for example, lumps attorneys with four to seven years of experience in the same

category; attorneys with eleven to nineteen [years of experience] also share the same hourly

rate."), a fee applicant may supplement the proffered fee matrix with additional evidence.  Such

additional evidence may include "surveys to update the matrix; affidavits reciting the precise

fees that attorneys with similar qualifications have received from fee-paying clients in

comparable cases; and evidence of recent fees awarded by the courts or through settlement to

attorneys with comparable qualifications handling similar cases."  Id.

Catholic Charities argues that the Court should apply rates in line with those set forth in

the highest experience level of the LSI Laffey Matrix; specifically, an hourly rate of $789 per

hour for the period from June 1, 2014, through May 31, 2015; $796 per hour for the period from

June 1, 2015, through May 31, 2016; and $820[6] per hour for the period from June 1, 2016,

through May 31, 2017.  See Pl.'s Mem., Ex. A (Cleveland Decl.) ¶¶ 10–11; see also id. at 11–12.

---

(. . . continued)
baseline" and then "adjusts these rates to account for inflation by using the Consumer Price Index for All Urban
Consumers (CPI–U) of the United States Bureau of Labor Statistics."  Eley, 793 F.3d at 101 (alteration in original)
(citation omitted); see also Def.'s Resp., Ex. 2 (Laffey Matrix: 2014–2015).

[6] The LSI Laffey Matrix provides an hourly rate of $826 for the period from June 1, 2016, through May 31, 2017,
which is higher than the rate Catholic Charities has requested for that period.  See Laffey Matrix,
http://www.laffeymatrix.com/see.html (last visited Nov. 16, 2017).  The Court does not find this discrepancy
significant, however, given that, as discussed infra, it declines to award fees at the LSI Laffey Matrix rates.

Contending that these rates are "unreasonable" and "ha[ve] not been justified" by Catholic

Charities, Def.'s Resp. at 7, the defendant proposes that the Court apply the rates set forth in the

highest experience level of the USAO Matrix, specifically, $520[7] per hour for the period from

June 1, 2014, through May 31, 2015; $568 per hour for the period from June 1, 2015, through

May 31, 2016; and $581 per hour for the period from June 1, 2016, through May 31, 2017, id. at

9; see also id., Ex. 3 (USAO Attorney's Fees Matrix: 2015–2017), id., Ex. 2 (Laffey Matrix:

2014–2015).[8]

      The District of Columbia Circuit's decision in Salazar provides the most recent guidance

as to how courts should determine whether a fee applicant has submitted sufficient evidence to

support the application of the LSI Laffey Matrix rates.  In Salazar, a Medicaid class action

brought under 42 U.S.C. § 1983, the Circuit upheld the district court's conclusion that the LSI

Laffey Matrix rates were presumptively reasonable, based on what the Circuit deemed a "great

deal of evidence regarding prevailing market rates for complex federal litigation" submitted by

the plaintiff, including an affidavit from Dr. Michael Kavanaugh, the economist who developed

the LSI Laffey Matrix; "billing rates tables demonstrating the difference between average

national law firm rates and the [ ] update[s] to the Laffey Matrix"; and a "2012 National Law

Journal Rates Survey [that] showed that the rates for partners in Washington, D.C. on the high-

end of the market far exceeded the rates in the LSI update."  809 F.3d at 64–65.  The Circuit

---

[7] Because the USAO Matrix does not purport to apply to work performed prior to June 1, 2015, see Def.'s Resp., Ex. 3 (USAO Attorney's Fees Matrix: 2015–2017), the defendant argues that the Court should apply the $520 rate set forth in the prior version of the USAO Matrix, the USAO Laffey Matrix, for work performed by Catholic Charities' counsel prior to that date, see id. at 9 n.4; see also id., Ex. 2 (Laffey Matrix: 2014–2015).

[8] The parties do not dispute that the Catholic Charities attorney who graduated from law school in 1975, see Pl.'s Mem., Ex. A (Cleveland Decl.) ¶ 2, qualifies for rates at the highest experience levels in each matrix, see id. at 11–12 (proposing rates corresponding to the rates set forth in the LSI Laffey Matrix for attorneys with 20+ years of experience); Def.'s Resp. at 9 (proposing rates corresponding to the rates set forth in the USAO Matrix for attorneys with 31+ years of experience).

concluded that "[w]ith these numbers and submissions in the record, the district court's point that 'the LSI-adjusted matrix is probably a conservative estimate of the actual cost of legal services in this area,' does not appear illogical."  Id. at 65 (emphasis removed).  Importantly, it further concluded that the defendant had failed to "rebut[] this logic with any relevant arguments."  Id.

In affirming the district court, the Circuit distinguished its prior decision in Eley, an Individuals with Disabilities Education Act ("IDEA") case.  Id. at 64.  In Eley, the Circuit had found that "the LSI Laffey Matrix, [Dr.] Kavanaugh's declaration explaining the LSI Laffey Matrix[,] and [the plaintiff's] lawyer's verified statement averring that [the lawyer] charged his paying clients the rates in the LSI Laffey Matrix" provided an insufficient basis for applying the LSI Laffey Matrix because the plaintiff failed to provide "evidence that her 'requested rates [were] in line with those prevailing in the community for similar services,' i.e., IDEA litigation." 793 F.3d at 104 (emphasis removed) (citation omitted).  The Circuit reasoned in Salazar that its rejection of the LSI Laffey Matrix rates in Eley was "based on evidence submitted by the [defendant] tending to show that, in the particular context of IDEA claims, there is a submarket in which attorneys' hourly fees are generally lower than the rates in either of the Laffey Matrices."  Salazar, 809 F.3d at 64 (citing Eley, 793 F.3d at 105).  By contrast, the defendant in Salazar "identifie[d] no such submarket, instead acquiescing in the notion that the litigation at issue qualifie[d] as complex federal litigation (as to which the Laffey Matrices apply)," id., and ultimately failing to rebut the plaintiff's evidence with any "relevant arguments," id. at 65 (rejecting the defendant's argument that the "prolonged litigation [wa]s depleting public funds").

Other members of this Court have interpreted Eley and Salazar as accepting two ways in which a plaintiff may demonstrate that the rates in its preferred matrix are presumptively reasonable.  First, a plaintiff may show that the "proceedings qualify as 'complex federal

15

litigation,' to which <u>Laffey</u> rates presumptively apply." <u>Flood v. District of Columbia</u>, 172 F. Supp. 3d 197, 210 (D.D.C. 2016). And once a plaintiff has made this threshold showing, the issue then becomes which version of the <u>Laffey</u> Matrix applies, and a plaintiff must show that its desired version properly reflects the prevailing rates for complex federal litigation. See <u>DL</u>, __ F. Supp. 3d at __, 2017 WL 3705067, at *8. Second, a plaintiff may show that the rates "customarily charged" by District practitioners in similar cases "are comparable to those provided" in its preferred matrix. See <u>Flood</u>, 172 F. Supp. 3d at 210 (in an IDEA case, the plaintiff must show rates customarily charged by IDEA practitioners); <u>see also</u> <u>DL</u>, __ F. Supp. 3d at __, 2017 WL 3705067, at *10 (same). Under either approach, however, a defendant may rebut a plaintiff's showing with specific countervailing evidence. See <u>Covington</u>, 57 F.3d at 1110. For the reasons explained below, the Court concludes that, under either approach, the evidence submitted by the parties demonstrates that the rates provided by the USAO Matrix are reasonable to apply in this case.

### a.  Prevailing Rates for Complex Federal Litigation

Here, the defendant "acquiesc[es] in the notion that the litigation at issue qualifies as complex federal litigation (as to which the <u>Laffey</u> Matrices apply)[,] . . . [because it] argues that one <u>Laffey</u> Matrix should apply instead of the other." <u>Salazar</u>, 809 F.3d at 64; <u>see</u> Def.'s Resp. at 9. And, the defendant does not argue or present evidence to suggest that FOIA litigation is a "submarket" of complex federal litigation. See <u>Salazar</u>, 809 F.3d at 64. Thus, according to <u>Salazar</u>, the "issue is whether [Catholic Charities has] submitted sufficient evidence for the . . . Court to conclude that the LSI <u>Laffey</u> Matrix applies," and if so, whether the defendant has rebutted that evidence. See <u>id.</u>; <u>see also</u> <u>DL</u>, __ F. Supp. 3d at __, 2017 WL 3705067, at *9.

In support of its position that the LSI <u>Laffey</u> Matrix rates more accurately reflect the relevant prevailing rate, Catholic Charities has submitted evidence from several of the categories identified by the Circuit in <u>Salazar</u> and <u>Covington</u>.  <u>See</u> <u>Salazar</u>, 809 F.3d at 65; <u>Covington</u>, 57 F.3d at 1109.  Its submissions, largely comprised of exhibits submitted by the plaintiffs in <u>DL</u>, include: (1) declarations from Dr. Kavanaugh, an economist and the developer of the LSI <u>Laffey</u> Matrix, in which he concludes that "the LSI <u>Laffey</u> Matrix is a better reflection of the prevailing market rates for complex federal litigation in Washington, D.C., than the USAO Matrix," Pl.'s Reply, Ex. B (Second Declaration of Dr. Michael Kavanaugh in Support of Plaintiffs' 2016 Fee Application, <u>DL v. District of Columbia</u>, Civ. Action No. 05-1437 (RCL) (D.D.C. Apr. 26, 2017) ("Kavanaugh Decl.")) ¶ 2; (2) market data that it argues demonstrate that the LSI <u>Laffey</u> Matrix rates are more in line with, and even underestimate, the prevailing market rate for complex federal litigation, <u>see</u> Pl.'s Reply, Ex. A (Affidavit of Carolyn Smith Pravlik (Aug. 23, 2017) ("Pravlik Aff.")) ¶¶ 15–17, 19; <u>id.</u>, Ex. C (Valeo Rates); <u>id.</u>, Ex. D (Collection of exhibits submitted by the plaintiffs in <u>DL</u>, Civ. Action No. 05-1437 (RCL) ("<u>DL</u> Plaintiffs' Exhibits"))[9]; (3) affidavits and declarations from District practitioners attesting that their billing rates are in line with the LSI <u>Laffey</u> Matrix rates and that, in their experience, the LSI <u>Laffey</u> Matrix rates are consistent with or below the prevailing rate for complex federal litigation in this District, <u>see generally</u> <u>id.</u>, Ex. D (<u>DL</u> Plaintiffs' Exhibits); and (4) several court decisions that have relied on the LSI <u>Laffey</u> Matrix rates to calculate an award of attorney's fees, <u>see</u> Pl.'s Mem. at 11; <u>see also</u> Pl.'s Reply at 9–10.

---

[9] Catholic Charities' Exhibit D is comprised of 75 exhibits submitted by the plaintiffs in <u>DL</u>.  <u>See</u> Pl.'s Reply, Ex. A (Pravlik Aff.) (List of Accompanying Exhibits from <u>DL v. District of Columbia</u>, No. 05-cv-1437 (RCL)).

To rebut Catholic Charities' evidence, the defendant has submitted evidence to demonstrate that the USAO Matrix rates better estimate the applicable prevailing rate. Its submissions include: (1) a declaration from the economist Dr. Laura A. Malowane, in which she concludes that "the USAO Matrix is superior to the [LSI Laffey] Matrix for estimating attorney fees in federal litigation cases in Washington, D[.]C[.]," see Def.'s Resp., Ex. 1 (Malowane Decl.) ¶ 14; (2) market data that it argues show that the rates in the LSI Laffey Matrix far exceed the prevailing rate for complex federal litigation, see id., Ex. 1 (Malowane Decl.) ¶¶ 28, 47; and (3) decisions of other courts that have relied on the USAO Matrix to calculate an award of attorney's fees, including the decision in DL, the case from which much of Catholic Charities' evidence originates, see id. at 8–9; see also Def.'s Notice at 1–2.

Although the Court finds that Catholic Charities has submitted a "great deal of evidence regarding [the] prevailing market rates for complex federal litigation" to demonstrate that its requested rates are entitled to a presumption of reasonableness, see Salazar, 809 F.3d at 64 (quoting Covington, 57 F.3d at 1110), the Court nonetheless concludes that the defendant has rebutted that presumption and shown that the current USAO Matrix is the more accurate matrix for estimating the prevailing rates for complex federal litigation in this District. The Court will address the evidence and arguments submitted by the parties in turn.

### i.    Declarations from Economists

Both parties have submitted declarations from economists in support of their preferred matrix. Catholic Charities has submitted several declarations from Dr. Kavanaugh, primarily relying on a declaration provided to support the plaintiffs' fee application in DL. See Pl.'s Reply, Ex. B (Kavanaugh Decl.). [10]    In his DL declaration, Dr. Kavanaugh concludes that the

---

[10] Catholic Charities has submitted a total of five declarations from Dr. Kavanaugh. The Court notes that three of

(continued . . . )

LSI Laffey Matrix is superior to the USAO Matrix because it is based on "an expert survey that targeted attorneys who were performing complex federal litigation and asked for billing rates for defined levels of experience," see id., Ex. B (Kavanaugh Decl.) ¶ 33, whereas the 2011 ALM survey underlying the USAO Matrix "obscures rates data for complex federal litigation by combining rates from complex litigation with rates from non-complex litigation," id., Ex. B (Kavanaugh Decl.) ¶¶ 10–12 (citing the inclusion of data from Virginia, West Virginia, and Maryland as one source of the problem because those jurisdictions have "more practitioners of [non-complex] legal services, such as DWI/DUI defense, wills and trusts, and simple bankruptcies").[11]  In response, the defendant has submitted a declaration from Dr. Malowane, in which she asserts that the survey underlying the USAO Matrix more accurately estimates the prevailing rates for complex federal litigation in part because "it is based on 2011 survey rates which are [twenty-two] years more recent than the rates relied upon in the [LSI Laffey] Matrix" and is therefore less prone to "forecasting error," Def.'s Resp., Ex. 1 (Malowane Decl.) ¶¶ 36–37 (quoting Dr. Kavanaugh's testimony regarding forecasting error in another case), and it has "more narrowly defined categories of years of experience" that "more accurately capture an

---

(. . . continued)
these declarations offer little support for Catholic Charities' position because they pre-date the USAO Matrix and, as a result, do not address its merits.  See Pl.'s Reply, Ex. D (DL Plaintiffs' Exhibits) at 795–803 (Affidavit of Dr. Michael Kavanaugh, Salazar ex rel. Salazar v. District of Columbia, Civ. Action No. 93-452 (D.D.C. Apr. 27, 2010)); id., Ex. D (DL Plaintiffs' Exhibits) at 810–16 (Affidavit of Dr. Michael Kavanaugh, Salazar, Civ. Action No. 93-452 (D.D.C. Sept. 26, 2010)); id., Ex. D (DL Plaintiffs' Exhibits) at 835–46 (Affidavit of Dr. Michael Kavanaugh, DL, Civ. Action No. 05-1437 (D.D.C. Apr. 25, 2012)).

[11] Catholic Charities takes issue with the fact that "the underlying data for the [USAO Matrix] survey [are] not publicly available [but rather] 'only available through . . . FOIA or through litigation.'  Pl.'s Reply at 5 (citing Pl.'s Reply, Ex. A (Pravlik Aff.) at 5).  However, Catholic Charities fails to explain what effect, if any, the availability of the data has on the data's reliability, and therefore, the Court does not find this argument persuasive.  In any event, it appears that Catholic Charities ultimately had access to these data, see id., Ex. D (DL Plaintiffs' Exhibits) at 588–658, 707–08, as did Dr. Kavanaugh, see id., Ex. B (Kavanaugh Decl.) ¶ 12 n.13.

individual attorney's fees," id., Ex. 1 (Malowane Decl.) ¶¶ 16–17 (comparing the USAO

Matrix's nine experience categories to the LSI Laffey Matrix's five).

Upon careful consideration of these declarations, the Court is persuaded that the

methodology of the 2011 ALM survey underlying the USAO Matrix is more reliable than the

methodology of the rates survey underlying the LSI Laffey Matrix. As Dr. Malowane asserts,

the USAO Matrix data are derived from "actual average billing rates of attorneys in the

Washington, D[.]C[.] area, from law offices of all sizes and types."[12] Id., Ex. 1 (Malowane

Decl.) ¶ 9. And importantly, these rates are based on far more current rate data from 2011, as

opposed to the 1989 rate data underlying the LSI Laffey Matrix. See id., Ex. 1 (Malowane

Decl.) ¶ 15 ("The more years [a] matrix continues without updating its original data source, the

more each year's forecasting errors may be compounded."); see also DL, __ F. Supp. 3d at __,

2017 WL 3705067, at *9 (concluding that the USAO Matrix is "more reliable and unbiased"

than the LSI Laffey Matrix in part because it is based on more recent data); Clemente v. Fed.

Bureau of Investigation, No. 08-cv-1252, 2017 WL 3669617, at *5 (D.D.C. Mar. 24, 2017)

(applying the USAO Matrix rates because that matrix "specifically measures rates in the legal

services industry, and is based on much more current data than the [LSI Laffey] Matrix").

Indeed, Dr. Kavanaugh concedes that matrices based on more recent survey data are "more likely

to produce an accurate forecast of billing rates," as he has used this premise to argue that the LSI

Laffey Matrix, which is based on data from 1989, is superior to the previous version of the

USAO Matrix, the USAO Laffey Matrix, which is based on data from 1981–82. See Pl.'s Reply,

---

[12] Dr. Kavanaugh argues that the USAO Matrix rate data are in fact based on "standard" as opposed to "actual" billing rates, but he fails to explain why this is significant. See Pl.'s Reply, Ex. B (Kavanaugh Decl.) ¶ 22. In the Court's view, this would only mean that the USAO Matrix rates overestimate the actual prevailing rate, because standard billing rates are likely higher than the rates actually charged or received. Cf. Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 80 F. Supp. 3d 1, 5 (D.D.C. 2015) (discounting LSI Laffey Matrix rates by fifteen percent "to account for the differences between reported rates and actual law firm billing realization").

Ex. D (DL Plaintiffs' Exhibits) at 844–45, 858 (explaining that, "[i]n general, the more

contemporary the observations, the less possibility exists for forecasting errors" and "[t]hus,

using the 1988–1989 Laffey survey data as the baseline is more likely to produce an accurate

forecast of billing rates because it applies an index to more recent observations to bring rates

forward to the present"); see also id., Ex. D (DL Plaintiffs' Exhibits) at 858 (same).[13]  Dr.

Malowane's conclusion that the USAO Matrix methodology is superior is further supported by

her testimony in DL, in which she explained that the data used in the USAO Matrix "are based

on a statistical survey of hundreds of attorneys in the Washington, D[.]C[.] area . . . [using]

survey parameters [that] ensure that the data published in the [survey] are reliable."  DL, __, F.

Supp. 3d at __, 2017 WL 3705067, at *9 (internal quotation marks omitted).

 The Court recognizes that the rate survey underlying the USAO Matrix is not perfect and

is perhaps over-inclusive as Catholic Charities argues, see Pl.'s Reply, Ex. B (Kavanaugh Decl.)

¶¶ 10–12; however, the Court finds it difficult to conclude that the rates underlying the LSI

Laffey Matrix are superior.  Despite claiming that the LSI Laffey Matrix rates are based on "an

expert survey that targeted attorneys who were performing complex litigation and asked for

billing rates for defined levels of experience," id., Ex. B (Kavanaugh Decl.) ¶ 33, Dr. Kavanaugh

does not explain, and Catholic Charities' evidence does not show, how these attorneys were

"targeted" or surveyed, see generally id., Ex. B (Kavanaugh Decl.); see also id., Ex. D (DL

---

[13] Dr. Malowane further argues that the index used to update the USAO Matrix is superior to the LSI Laffey Matrix index because it "more accurately captures the types of purchasers, sellers, prices[,] and services that exist in the federal litigation industry."  Def.'s Resp., Ex. 1 (Malowane Decl.) ¶ 28; see also id., Ex. 1 (Malowane Decl.) ¶¶ 22, 33.  Dr. Kavanaugh does not directly address Dr. Malowane's criticism of the LSI Laffey Matrix index, but rather asserts that "there is no material difference between the price indices used to adjust the surveyed rates."  Pl.'s Reply, Ex. B (Kavanaugh Decl.) ¶ 3.  Given the Court's conclusion that the USAO Matrix methodology is superior because it is based on a more accurate data survey, and in light of Dr. Kavanaugh's concession that the indices used to update the matrices are not materially different, the Court need not determine whether Dr. Malowane is correct that the USAO Matrix's index is more accurate.

Plaintiffs' Exhibits) at 286–91 (declaration of Joseph A. Yablonski explaining that in preparing

the 1989 survey underlying the LSI Laffey Matrix, Yablonski spoke with "Daniel Reznick who

developed the original Laffey Matrix"; "reviewed . . . information regarding hourly rates . . .

submitted by the firm of Steptoe & Johnson" in another case; "spoke with attorneys from various

firms," but listing only seven; "compared the rates [he] had found with the rates set forth in two

broad-ranging surveys of hourly rates published in the National Law Journal"; and "shared

copies [of the matrix] with various attorneys who have been active in statutory fee litigation in

this jurisdiction"); DL, __ F. Supp. 3d at __, 2017 WL 370567, at *9 (citing testimony provided

by Dr. Malowane that "Mr. Yablonski never explained how he identified the attorneys and firms

to sample, the number of attorneys he spoke with, how many data points were collected to derive

each individual billing rate in the matrix, or how many data points were collected in total").  For

these reasons, although each of the declarations provides some support for each party's preferred

matrix, the Court finds that Dr. Malowane's conclusions are ultimately more convincing.

### ii.    Market Data

Both parties have also submitted market data to demonstrate that the rates in their

preferred matrix better estimate the prevailing market rate for complex federal litigation in the

District.  Catholic Charities has submitted three sets of market data, each which it claims

demonstrate that the LSI Laffey Matrix rates are more in line with, and even underestimate, the

prevailing market rate.  First, Catholic Charities has submitted data compiled by the law firm

Terris, Pravlik & Millian, LLP, based on "affidavits from attorneys familiar with the marketplace

and affidavits and other materials from fee applications in other cases" (the "TPM data"), see

Pl.'s Reply, Ex. A (Pravlik Aff.) ¶¶ 15–17; see also id., Ex. D (DL Plaintiffs' Exhibits) at 367–

70, which Catholic Charities claims "show that the USAO Matrix [ ] rates are 29.68[ percent]

below market, and the LSI <u>Laffey</u> Matrix [rates are] 9.36[ percent] below market," <u>id.</u>, Ex. A (Pravlik Aff.) ¶ 17; <u>see also id.</u> at 8; <u>id.</u>, Ex. B (Kavanaugh Decl.) ¶ 18.  Second, it has submitted data compiled by the law firm Arent Fox based on 2012–2013 attorney hourly rates collected from a database maintained by Valeo Partners LLC (the "Valeo data"), <u>see</u> Pl.'s Reply, Ex. C; <u>id.</u>, Ex. D (<u>DL</u> Plaintiffs' Exhibits) at 409–16, which it claims demonstrate that the prevailing market rates for complex federal litigation "exceed the LSI <u>Laffey</u> Matrix rates," <u>id.</u>, Ex. A (Pravlik Aff.) ¶ 19; <u>see also id.</u> at 8; <u>id.</u>, Ex. B (Kavanaugh Decl.) ¶¶ 19–21.  Third,  it has submitted data from the 2014 National Law Journal Billing Survey for Washington, D.C.-based firms, <u>see id.</u>, Ex. D (<u>DL</u> Plaintiffs' Exhibits) at 432, which, according to the declarant who presented these data in <u>Makray v. Perez</u>, Civ. Action No. 12-520, demonstrate that the highest LSI <u>Laffey</u> Matrix rate for 2014–2015 of $789 per hour is "well below the average high[-end] partner rate and within $50 per hour of the average partner billing rate [of $743 per hour]," <u>see id.</u>, Ex. D (<u>DL</u> Plaintiffs' Exhibits) at 425.

In response, the defendant relies on two sets of market data that Dr. Malowane argues demonstrate that the LSI <u>Laffey</u> Matrix rates far exceed the relevant prevailing rate.  First, it relies on the 2011 ALM survey rates underlying the USAO Matrix itself, which it argues demonstrate that the LSI <u>Laffey</u> Matrix "provides rates that are much higher than the actual rates seen in the [Washington, D.C.] area."  Def.'s Resp., Ex. 1 (Malowane Decl.) ¶ 28 & Table ("tbl.") 2 (showing that the LSI <u>Laffey</u> Matrix rate for 2011 for attorneys with 20+ years of experience is 54.5 percent higher than the rate provided by the 2011 ALM survey for that same year).  Second, it cites the same data from the 2014 National Law Journal Billing Survey for Washington, D.C.-based firms that Catholic Charities cites, but interprets that data differently, arguing that they show that the LSI <u>Laffey</u> Matrix rates are excessive, given that the LSI <u>Laffey</u>

Matrix's highest rate of $789 per hour is "even higher than the [$743 per hour] average billing rate of partners at the nation's largest law firms headquartered in the Washington[,] D[.]C[.] area." Id., Ex. 1 (Malowane Decl.) ¶ 47 & tbl. 5.

Although Catholic Charities' market data provide some support for the rates reflected in the LSI Laffey Matrix, see Salazar, 809 F.3d at 65, in light of the evidence submitted by the defendant, including an analysis of these same data by the court in DL, it appears to the Court that these data are not sufficiently reliable to overcome the questions raised about the LSI Laffey Matrix's methodology.  As the court in DL observed, the TPM data have "several methodological issues," including that they (1) "rely in part on billing rates in bankruptcy matters, which are generally not conducted for fee paying clients and which tend to be higher than rates charged for other types of cases"; (2) do "not include[] the rates for practitioners without the labels of 'partner' or 'associate'"; and as discussed further in Part III.B.1.a.iii of this opinion, (3) "it is unclear whether [the attorneys surveyed] actually received the[] rates" they allegedly charge.  See DL, __ F. Supp. 3d at __, 2017 WL 3705067, at *10 (emphasis omitted).  As to the Valeo data, although Catholic Charities claims that these data represent rates that were "actually billed to a client or submitted to a court," Pl.'s Reply, Ex. A (Pravlik Aff.) ¶ 19; id., Ex. D (DL Plaintiffs' Exhibits) at 405, it appears that the data also rely in part on the typically higher billing rates in bankruptcy matters, see id., Ex. D (DL Plaintiffs' Exhibits) at 410–16 (reflecting that approximately one quarter of the rates collected were from attorneys whose reported "Industry" is bankruptcy).  As to the 2014 National Law Journal survey data, which are derived from the rates of attorneys from twelve District-based law firms, see Pl.'s Reply, Ex. D (DL Plaintiffs' Exhibits) at 432, these data "reflect[] the rates charged by only a subset of Washington, D.C.-based attorneys" and those rates are "not tied to any particular type of

litigation." <u>Makray v. Perez</u>, 159 F. Supp. 3d 25, 51 (D.D.C. 2016); <u>see also</u> <u>DL</u>, __ F. Supp. 3d at __, 2017 WL 3705067, at *9 (observing that "reliance on National Law Journal surveys has been called into question by" at least five judges in this District).

In addition, it appears that these data may also be unreliable because they heavily rely on rates from attorneys at some of the nation's largest law firms.  <u>See</u> Pl.'s Reply, Ex. D (<u>DL</u> Plaintiffs' Exhibits) at 410–16 (reflecting that approximately three-quarters of the roughly 400 rates included in the Valeo data were drawn from attorneys at "big law" firms such as Kirkland & Ellis LLP, Gibson, Dunn & Crutcher LLP, Jones Day, Wilmer Hale, and Weil, Gotshal & Manges LLP); <u>see also</u> Def.'s Resp., Ex. 1 (Malowane Decl.) ¶ 58 (explaining that the 2014 National Law Journal survey data by definition include rates from only the nation's 350 largest law firms).  According to Dr. Malowane, the rates of attorneys at large law firms are likely to be higher than the rates of attorneys at mid-sized or small firms given a variety of factors, including that "small firms generally are able to offer services at lower fees" due to lower overhead, and "larger multinational firms may be able to command higher fees due to, among other reasons, an offering of more services, having a better national or international reputation, having the capacity to take on bigger or more complicated matters, or being located in a higher rent and higher profile area of the region."  Def.'s Resp., Ex. 1 (Malowane Decl.) ¶ 42; <u>see also</u> <u>id.</u>, Ex. 1 (Malowane Decl.) ¶¶ 44–45 (citing as support data from the 2014 National Law Journal survey, which demonstrate that "attorney billing rates do in fact increase with the number of lawyers at the attorney's law firm").  Although Dr. Kavanaugh argues that the market price of complex federal litigation services does not vary by firm size, unlike Dr. Malowane, he does not appear to support his position with any data in the record.  <u>See</u> Pl.'s Reply, Ex. D (<u>DL</u> Plaintiffs' Exhibits) at 843 (comparing legal services to "[a] barrel of oil[, which] sells for the same price" regardless

of where it is produced, but citing no data to support that this is an appropriate analogy).

Therefore, the Court finds that Catholic Charities' market data relying primarily on the rates of

attorneys at the nation's largest law firms provide only limited support for application of the LSI

Laffey Matrix rates.  See Heller v. District of Columbia, 832 F. Supp. 2d 32, 45 (D.D.C. 2011)

(declining to apply the LSI Laffey Matrix rates where the plaintiff's evidence in support of those

rates was "based upon the rates typically charged by practitioners at the largest law firms in the

District," because the plaintiff "fail[ed] to establish that [its] requested rates are, in fact, the

prevailing market rates for attorneys engaged in complex federal litigation outside of the 'big

firm' context"); see also Blackman v. District of Columbia, 677 F. Supp. 2d 169, 176 (D.D.C.

2010) (agreeing with the defendants that the rates provided in a National Law Journal survey did

not support the application of rates comparable to the LSI Laffey Matrix rates in part because

"th[e] [National Law Journal] rates came from the largest and most prestigious law firms, not

from a representative sampling of firms").[14]

The Court acknowledges that no data set is perfect, including the 2011 ALM survey

underlying the USAO Matrix, which, as already discussed, has been criticized as over-inclusive.

See Pl.'s Reply, Ex. B (Kavanaugh Decl.) ¶¶ 10–12; see also Makray, 159 F. Supp. 3d at 51

(criticizing the 2011 ALM survey for "includ[ing] . . . rates charged by attorneys across all

---

[14] The Court acknowledges that it is the position of at least one member of this Court that, in determining the prevailing rate, "differentiation [between the prevailing rates for larger and smaller firms] has been explicitly rejected by the Supreme Court and the D.C. Circuit."  See Makray, 159 F. Supp. 3d at 52 (alterations in original) (quoting Eley v. District of Columbia, 999 F. Supp. 2d 137, 155 (D.D.C. 2013)).  However, it appears to the Court that the Supreme Court and Circuit decisions cited for this proposition do not go as far as represented, as they merely conclude that "reasonable fees . . . are to be calculated according to the prevailing market rates in the relevant community, regardless of whether [the] plaintiff is represented by private or nonprofit counsel," Blum, 465 U.S. at 895, or by private counsel charging "reduced rates reflecting non-economic goals," Save Our Cumberland Mountains, Inc., 857 F.2d at 1524.  Here, the Court agrees that Catholic Charities' attorney should be compensated at the "prevailing market rate," but it expresses doubt that the prevailing market rate can be accurately determined without reference to a representative sampling of rates from firms of all sizes.  See Heller, 832 F. Supp. 2d at 46 n.10 ("Data regarding the rates typically charged by large law firms in the District of Columbia is certainly relevant . . . .  It is not, however, the only (or most) relevant data.").

practice areas," which "significantly undermines the degree to which this survey fairly reflects rates charged by attorneys engaged principally in complex federal litigation"); EPIC, 218 F. Supp. 3d at 49 (similar).  However, in light of the significant questions raised by the LSI Laffey Matrix's original survey, and the limited value of Catholic Charities' market data in filling in the gaps, the Court remains persuaded that the USAO Matrix is a more reliable, albeit imperfect, estimator of the prevailing rates for complex federal litigation in this District.

### iii.   Declarations from Practitioners

Catholic Charities has also submitted affidavits and declarations from District practitioners attesting that their billing rates are in line with the LSI Laffey Matrix rates and that, in their experience, the LSI Laffey Matrix rates are consistent with or below the prevailing rate for complex federal litigation in this District.  See, e.g., Pl.'s Reply, Ex. D (DL Plaintiffs' Exhibits) at 90–93, 372–445, 469–76, 499–513.  Although a plaintiff may support its fees application with "affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases," see Covington, 57 F.3d at 1109, as the court in DL recognized in considering these very same declarations, many of these practitioners merely claim that they billed or charged rates comparable to the LSI Laffey Matrix rates, not that they actually received such rates, see DL, __ F. Supp. 3d at __, 2017 WL 3705067, at *11; see also, e.g., Pl.'s Reply, Ex. D (DL Plaintiffs' Exhibits) at 91 (affidavit of Cyrus Mehri, discussing the "standard hourly rate" that is "typically charge[d]" by his firm for his services); id., Ex. D (DL Plaintiffs' Exhibits) at 374 (declaration of Mark N. Bravin, explaining that his requested rates were based on "the usual rates [his firm] has customarily applied in billing its clients").  Such declarations do not adequately show that the LSI Laffey Matrix reflects the actual prevailing rates for complex federal litigation in the District.  See Covington, 57 F.3d at

1109; <u>see also</u> <u>DL</u>, __ F. Supp. 3d at __, 2017 WL 3705067, at *10–11; <u>Taylor</u>, 205 F. Supp. 3d

at 85 (concluding that affidavits submitted by the plaintiff were not sufficient evidence of

prevailing rates in IDEA litigation because "they lack any recitation of the precise fees that they

have [actually] received" (alteration in original) (internal citation omitted) (quoting <u>Wilhite v.

District of Columbia</u>, 196 F. Supp. 3d 1, 9 (D.D.C. 2016))).

> ### iv.    Fee Awards in Other Cases

Both parties also cite cases in which courts have relied on the rates in their preferred

matrix to calculate fee awards.  Catholic Charities cites several decisions in which courts have

relied on the LSI <u>Laffey</u> Matrix rates; <u>see</u> Pl.'s Mem. at 11; <u>see also</u> Pl's Reply at 9–10;

however, these decisions offer little support for applying the LSI <u>Laffey</u> Matrix rates here.  First,

Catholic Charities cites <u>Salazar</u>, arguing that the Circuit in that case "approved the use of LSI-

adjusted <u>Laffey</u> rates," and, as a result, "[t]hose rates should be used here."  Pl.'s Mem. at 11.

However, the Circuit in <u>Salazar</u> concluded only that, based on the evidence submitted by the

plaintiff in that case and the defendant's failure to rebut that evidence with any "relevant

arguments," the "district court's point that 'the LSI-adjusted matrix is probably a conservative

estimate of the actual cost of legal services in this area,' d[id] not appear illogical."  <u>Salazar</u>, 809

F.3d at 65 (emphasis removed) (quoting <u>Salazar v. District of Columbia</u>, 991 F. Supp. 2d 39, 48

(D.D.C. 2014)); <u>see also</u> <u>Smith v. District of Columbia</u>, 249 F. Supp. 3d 106, 113 (D.D.C. 2017)

("While [the <u>Salazar</u> court] upheld a district court's approval of the higher matrix based on the

record before it in that case, it did not dispense with the three-pronged test for establishing the

reasonableness of a requested rate in any individual future case.").  <u>But see</u> <u>Makray</u>, 159 F. Supp.

3d at 36 (agreeing with the plaintiff that "the <u>Salazar</u> Court 'confirmed the superior accuracy of

the LSI[ <u>Laffey</u> Matrix] rates' and that th[e] [ ] LSI [<u>Laffey</u>] Matrix represents a conservative

estimate of the prevailing rates for legal services, at least for complex federal litigation, in the District").  Here, although Catholic Charities has submitted many of the same types of evidence as the plaintiff in Salazar, see Salazar, 809 F.3d at 64–65, the Court finds that the defendant has submitted evidence sufficient to rebut that evidence, see DL, __ F. Supp. 3d at __, 2017 WL 3705067, at *10 (distinguishing Salazar because the defendant, relying in part on a declaration from Dr. Malowane, "rebutted [the] plaintiffs' arguments to the satisfaction of th[e] Court").

As the defendant points out, see Def.'s Resp. at 9, neither Salazar nor any of the other decisions cited by Catholic Charities considered the new USAO Matrix, see Salazar, 809 F.3d at 58 (considering the previous version of the USAO Matrix, known as the USAO Laffey Matrix); see also Interfaith Cmty. Org. v. Honeywell, 726 F.3d 403, 415–16 (3d Cir. 2013) (same); Herrera v. Mitch O'Hara LLC, __ F. Supp. 3d __, __, No. 16-cv-1726, 2017 WL 2869410, at *5 (D.D.C. July 5, 2017) (not considering either version of the USAO's matrices because the D.C. Code mandated application of the LSI Laffey Matrix rates); Hernandez v. Chipotle Mexican Grill, Inc., __ F. Supp. 3d __, __, No. 14-cv-297, 2017 WL 2804867, at *11 (D.D.C. June 28, 2017) (same); Texas v. United States, 247 F. Supp. 3d 44, 55 (D.D.C. 2017) (same);[15] EPIC, 218 F. Supp. 3d at 49 (same); EPIC v. Dep't of Homeland Sec., 197 F. Supp. 3d 290, 295 (D.D.C. 2016) (same); Makray, 159 F. Supp. 3d at 32 (same); Citizens for Responsibility & Ethics in Wash., 80 F. Supp. 3d 1, 3 (D.D.C. 2015) (same), and thus, they offer little support for Catholic Charities' position that the LSI Laffey Matrix is superior to the USAO Matrix, see EPIC v. U.S. Drug Enf't Admin., __ F. Supp. 3d __, __, No. 15-cv-667, 2017 WL 3049403, at *5 (D.D.C. July

---

[15] Although the court in Texas cites a URL that directs the reader to the current USAO Matrix, its explanation of the matrix that it considered makes clear that it was referencing the USAO Laffey Matrix.  See 247 F. Supp. 3d at 50 ("The USAO Laffey Matrix adjusts the original 1980s rates to account for inflation by using the Consumer Price Index for All Urban Consumers . . . , which measures prices across several commodities in a specific geographic area[.]").

18, 2017) (concluding that the cases cited by the plaintiff were "inapposite . . . insofar as they d[id] not discuss the updated USAO [M]atrix's new methodology, and the billable hours they were assessing likely occurred prior to the period covered by it").  Further, in two of these cases, the courts did not assess the LSI <u>Laffey</u> Matrix on its merits, but rather applied it either because the parties did not dispute its applicability, <u>see</u> EPIC, 197 F. Supp. 3d at 295, or because District of Columbia Code mandated its application in the particular legal context, <u>see</u> <u>Herrera</u>, __ F. Supp. 3d at __, 2017 WL 2869410, at *5 (applying District wage enforcement laws).  And in <u>Hernandez</u>, like in <u>Salazar</u>, the Court applied the LSI <u>Laffey</u> Matrix only after finding that the defendant had failed to rebut the plaintiff's evidence, <u>see</u> __ F. Supp. 3d at __, 2017 WL 2804867, at *11 ("The defendant fails to provide any actual evidence that the LSI <u>Laffey</u> rate is unreasonable . . . , providing no affidavits or declarations of its own, no surveys of any rates charged in the Washington, D.C. legal market, no economic analyses of the prevailing market rate, or even examples of the rates it is charged by its own counsel for similar cases."), whereas here, the Court finds that the defendant has rebutted Catholic Charities' evidence.

In rebuttal, the defendant cites two decisions from this District that considered the merits of the USAO Matrix and concluded that it better approximates prevailing rates for complex federal litigation in this District.  Specifically, the plaintiff cites <u>DL</u>, which, as the defendant points out, <u>see</u> Def.'s Notice at 1, considered nearly all of the same declarations, data, and other evidence that Catholic Charities and the defendant have submitted here and ultimately concluded that the USAO Matrix more reliably estimates the prevailing rate.  <u>See</u> <u>DL</u>, __ F. Supp. 3d at __, 2017 WL 2705067, at *9–10.  The defendant also cites Judge Cooper's decision in <u>EPIC</u>, which applied the USAO Matrix rates in part based on testimony from Dr. Malowane similar to that provided by the defendant here, including testimony that the USAO Matrix "is based on 2011

rather than 1989 billing rates." __ F. Supp. 3d at __, 2017 WL 3049403, at *5.[16]  Further, as to

the courts that previously applied the LSI <u>Laffey</u> Matrix rates rather than the now superseded

USAO <u>Laffey</u> Matrix, the USAO Matrix's updated index has mooted at least some of those

courts' criticisms of the USAO <u>Laffey</u> Matrix, suggesting that those courts, if presented with the

improved USAO Matrix, might reconsider their conclusion that the LSI <u>Laffey</u> Matrix is

superior.  <u>See, e.g.</u>, <u>Salazar</u>, 991 F. Supp. 2d at 47 (concluding that "the [LSI] <u>Laffey</u> index . . .

captur[es] the more relevant data because it is based on the legal services component of the

Consumer Price Index [("CPI")] rather than the general CPI on which the [USAO <u>Laffey</u> M]atrix

is based")).

        In sum, although the evidence submitted by Catholic Charities provides some support for

use of the LSI <u>Laffey</u> Matrix, the Court concludes that the defendant has rebutted that evidence

and shown that the USAO Matrix more reliably approximates the prevailing rate for complex

federal litigation in the District.

### b.  Prevailing Rates for FOIA Litigation

        Despite concluding that the USAO Matrix is the better estimator of rates for complex

federal litigation in this District, the Court recognizes that Catholic Charities may also support its

requested rate by demonstrating that the "rates customarily charged by [FOIA] practitioners in

the District are comparable to those provided under" the LSI <u>Laffey</u> Matrix.  <u>See</u> <u>Flood</u>, 172 F.

Supp. 3d at 210.  However, Catholic Charities has failed to do so here.

---

[16] Although Catholic Charities is correct that the plaintiff in <u>EPIC</u> failed to respond to the defendant's evidence
supporting the USAO Matrix, <u>see</u> Pl.'s Reply at 4, the court nevertheless assessed the merits of each matrix in light
of "the case law and the supporting evidence offered by both parties," including evidence submitted by the plaintiff
in support of the LSI <u>Laffey</u> Matrix, and ultimately concluded that the USAO Matrix was "the most suitable
choice."  <u>See</u> __ F. Supp. 3d at __, 2017 WL 3049403, at *5.

Only three of the declarations submitted by Catholic Charities are from practitioners who represent that they practice FOIA litigation.  However, two of these declarants do not claim to have received, or even charged, rates in line with the LSI <u>Laffey</u> Matrix for their services in FOIA cases.  <u>See</u> Pl.'s Reply, Ex. D (<u>DL</u> Plaintiffs' Exhibits) at 469–76 (claiming that declarant's firm "has extensive experience litigating complex FOIA . . . cases," that its "standard market rates" are in line with LSI <u>Laffey</u> Matrix rates, and that some clients have been "billed and paid fees at the firm's hourly standard market rates," but not claiming those fees were billed or paid for services in FOIA cases); <u>id.</u>, Ex. D (<u>DL</u> Plaintiffs' Exhibits) at 477–82 (claiming to have turned down "FOIA cases with potential clients who were willing to pay an hourly rate based on the LSI[] <u>Laffey</u> [M]atrix rate," but not claiming that any clients actually paid such rates in FOIA cases).  The third declaration, from Catholic Charities' attorney in this case, cites evidence that another member of this Court previously awarded him a rate of $568 per hour in a FOIA case, <u>see</u> Pl.'s Mem., Ex. A (Cleveland Decl.) ¶ 9; however, that rate was derived from the USAO Matrix, based on the Court's conclusion that Catholic Charities failed to produce evidence sufficient to justify that his services warranted LSI <u>Laffey</u> Matrix rates, <u>see</u> Memorandum Opinion and Order at 11, <u>Abtew v. Dep't of Homeland Sec.</u>, Civ. Action No. 13-cv-1566 (D.D.C. Mar. 31, 2016).[17]

Moreover, only three of the cases cited by Catholic Charities are FOIA cases.  <u>See</u> <u>EPIC</u>, 218 F. Supp. 3d at 49; <u>EPIC</u>, 197 F. Supp. 3d at 295; <u>Citizens for Responsibility & Ethics in Wash.</u>, 80 F. Supp. 3d at 4.  And these cases are distinguishable for reasons already discussed, including that they did not consider the new USAO Matrix.  Additionally, in Judge Kessler's

---

[17] Catholic Charities' attorney cites only one other fee award of $60 per hour that he received in <u>Cerjan v. Fasula</u>, 539 F. Supp. 1226, 1236 (N.D. Ohio 1981), a civil rights case brought under 42 U.S.C. § 1983, <u>see</u> Pl.'s Mot, Ex. A (Cleveland Decl.) ¶ 3; however, that rate offers no support for the significantly higher rates he requests here.

decision in EPIC, the Court found it "significant that the Government recently conceded in another FOIA case in which EPIC was the plaintiff that EPIC's attorneys were entitled to attorney['s] fees based on the LSI Laffey [Matrix]." 218 F. Supp. 3d at 49 ("Given the very same attorneys, working for the very same organization, litigating the very same questions in both cases, it is hard to believe that the prevailing market rate would differ."). Although Catholic Charities argues that the defendant here similarly conceded that the LSI Laffey Matrix rates or comparable rates should apply by agreeing to them in two other cases, see Pl.'s Reply at 9, neither of those cases involved Catholic Charities or its attorney, see EPIC, 197 F. Supp. 3d at 295; Biery v. United States, Nos. 07–693L and 07–675L, 2012 WL 5914260, at *4 (Fed. Cl. Nov. 27, 2012). Moreover, the Court in Citizens for Responsibility & Ethics in Washington justified the higher LSI Laffey Matrix rates in part because "[t]he case . . . involve[d] a matter of national public interest" and "the litigation . . . [wa]s aptly described as 'complex,'" 80 F. Supp. 3d at 5, and even then, as Catholic Charities acknowledges, see Pl.'s Mem. at 11, the court only accepted the rates as a "starting point," ultimately discounting them by fifteen percent "to account for the differences between reported rates and actual law firm billing realization," 80 F. Supp. 3d at 5. Here, Catholic Charities does not argue that the complexity of this particular litigation warrants the higher LSI Laffey Matrix rates. See generally Pl.'s Mem; see also Pl.'s Reply. Nor could it. The litigation for which Catholic Charities seeks fees—the litigation of its ninth cause of action—involved a single FOIA request and one document responsive to that request, did not implicate novel legal issues, and with the exception of one motion hearing, required no hearings or other courtroom or in chambers proceedings.

The remainder of the decisions cited by Catholic Charities involve litigation under statutes other than the FOIA. See Salazar, 809 F.3d 58 (Medicaid class action under 42 U.S.C.

§ 1983); Interfaith Cmty. Org., 726 F.3d at 406 (Resource Conservation and Recovery Act);

Makray, 159 F. Supp. 3d at 27 (Title VII); Hernandez, __ F. Supp. 3d at __, 2017 WL 2804867,

at *1 (Title VII); Texas, 247 F. Supp. 3d at 46 (Voting Rights Act); Herrera, __ F. Supp. 3d at

__, 2017 WL 2869410, at *1 (Fair Labor Standards Act and District of Columbia law).

Consequently, these cases are not "evidence of recent fees awarded by the courts or through

settlement to attorneys with comparable qualifications handling similar cases." Covington, 57

F.3d at 1109 (emphasis added); see also DL, __ F. Supp. 3d at __, 2017 WL 3705067, at *11

(rejecting three cases cited by the plaintiffs as evidence of the prevailing rates customarily

charged by IDEA practitioners because "none . . . were IDEA cases").

　　　　Catholic Charities' remaining evidence is likewise unavailing.  First, it cites section

§ 32-1308 of the District of Columbia Code, which requires courts to award attorney's fees at the

LSI Laffey Matrix rates for claims brought under the District's wage enforcement laws, see

Herrera, __ F. Supp. 3d at __, 2017 WL 2869410, at *5, claiming that "[t]his endorsement by a

local government body[] that the LSI [Laffey Matrix] is reasonable, is strong evidence of the

reasonableness of the matrix," Pl.'s Reply at 9.  Catholic Charities cites Makray as support for

this position, see id.; however, the court in Makray concluded only that the District of Columbia

Code's "endorsement . . . in the context of wage enforcement litigation provides additional

evidence that the rates included in [the LSI Laffey M]atrix are equally reasonable in the context

of arguably more complex gender discrimination suits brought under a federal civil rights

statute," 159 F. Supp. 3d at 48.  However, Catholic Charities does not claim that the FOIA

litigation at issue here is as complex or more complex than wage enforcement litigation.

Catholic Charities also claims that Dr. Malowane's declaration in this case is undermined by her

testimony in Biery, 2012 WL 5914260, at *4, by having testified that "some lawyers [in that

case] deserved $705 per hour" for attorney's fees.  See Pl.'s Reply at 7.  However, Dr. Malowane

merely testified that Arent Fox's "national hourly partner rate" of $705 per hour for the firm's

work in a Fifth Amendment just compensation case "f[e]ll reasonably within the range of rates

for comparable 'national' firms" based in Washington, D.C., which she estimated was between

$195 and $999 per hour for partners.  Biery, 2012 WL 5914260, at *4 (emphasis added).  She

therefore did not conclude that a rate of $705 per hour is the prevailing rate for complex federal

litigation or specifically for FOIA litigation in the District.  See id.

In sum, Catholic Charities has failed to show that FOIA litigation, or this litigation in

particular, warrants the higher rates set forth in the LSI Laffey Matrix.  The Court accordingly

finds it appropriate to compensate Catholic Charities at the prevailing rate for complex federal

litigation, which as the Court explained above, see supra Part III.B.1.a, is best approximated by

the rates set forth in the current USAO Matrix.

### 2.   Number of Hours

Having resolved the issue of which rate to apply, the Court must next determine the

number of hours "reasonably expended" litigating this case by Catholic Charities' attorney.  See

Bd. of Trs. of Hotel & Rest. Emps. Local 25, 136 F.3d at 801.  To satisfy its burden to show the

reasonableness of hours expended, a party requesting fees must provide "contemporaneous,

complete and standardized time records which accurately reflect the work done by each

attorney."  Nat'l Ass'n of Concerned Veterans, 657 F.2d at 1327.  "[S]upporting documentation

must be of sufficient detail and probative value to enable the court to determine with a high

degree of certainty that such hours were actually and reasonably expended." Role Models, 353 F.3d at 970 (quoting In re Olson, 884 F.2d 1415, 1428 (D.C. Cir. 1989) (per curiam)).

"A plaintiff's overall success on the merits . . . must be considered in determining the reasonableness of a fee award." Judicial Watch, 470 F.3d at 369 (citing Farrar v. Hobby, 506 U.S. 103, 114 (1992)); see also Hensley v. Eckerhart, 461 U.S. 424, 440 (1983) ("We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees[.]").  Thus, "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained," Hensley, 461 U.S. at 440, excluding "'nonproductive time or . . . time expended on issues on which [the] plaintiff ultimately did not prevail,'" Weisberg, 745 F.2d at 1499 (citation omitted). The Supreme Court has explained that

> [b]ecause . . . the district court [must] consider the relationship between the amount of the fee awarded and the results obtained, fees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation. For example, if the Government's challenge to a requested rate for paralegal time resulted in the court's recalculating and reducing the award for paralegal time from the requested amount, then the applicant should not receive fees for the time spent defending the higher rate.

Commissioner, INS v. Jean, 496 U.S. 154, 163 n.10 (1990).

Catholic Charities seeks fees for a total of 17.25 hours,[18] 8 hours of which it expended on litigating its ninth cause of action and 9.25 hours of which it expended on litigating its present request for attorney's fees and costs.[19]  See Pl.'s Mot., Ex. B (Itemization of Hours).  The

---

[18] Catholic Charities has requested fees for a total of 16.85 hours, see Pl.'s Mem. at 11–12; id., Ex. A (Cleveland Decl.) ¶ 11, but the itemized entries in Catholic Charities' "Itemization of hours" appended to its renewed summary judgment motion yield a slightly higher total of 17.25 hours, see Pl.'s Mem., Ex. B (Itemization of hours).  The Court finds it appropriate to calculate Catholic Charities' fee award based on the sum of Catholic Charities' time entries, rather than the totals it provides in its briefings.

[19] The parties appear to agree that all but one of the time entries for the period from June 1, 2016, to June 6, 2016, relate to Catholic Charities attorney's fees request.  See Def.'s Resp. at 6 n.3 (excluding only one entry for 0.9 hours

(continued . . . )

defendant does not challenge the reasonableness of the hours expended by Catholic Charities on its ninth cause of action, but only challenges the hours Catholic Charities claims it expended litigating its present fees request, i.e., its requested "fees on fees."  See Def.'s Resp. at 9–10.

Based on its review of the billing records submitted by Catholic Charities' attorney, and in light of the absence of any objection from the defendant, the Court finds it appropriate to compensate Catholic Charities for the hours its attorney alleges he expended on the ninth cause of action, with one exception.  That one exception encompasses the three hours the attorney represents he expended preparing Catholic Charities' original summary judgment motion regarding its ninth cause of action and its reply in response to the defendant's opposition, see Pl.'s Mem., Ex. B (Itemization of Hours),[20] because the Court ultimately denied that motion, see Gatore, 177 F. Supp. 3d at 55.  The Court therefore finds that it must exclude that time from Catholic Charities' award.  See Weisberg, 745 F.2d at 1499 (excluding "'nonproductive time or . . . time expended on issues on which [the] plaintiff ultimately did not prevail'").  As to the remaining 4.6 hours claimed, although some of Catholic Charities' entries are lacking in detail and potentially overbroad, see, e.g., Pl.'s Mem., Ex. B (Itemization of Hours) (recording 0.5 hours  for "improving complaint"), the Court is satisfied that a mere 4.6 hours expended on litigating Catholic Charities' ninth cause of action—which included drafting relevant portions of the complaint and reviewing relevant filings in this case, such as the defendant's revised Vaughn index—is a reasonable, and likely a conservative estimate of the amount of time necessary to

---

(. . . continued)

for "review of ECF # 17, 23, and 25" to arrive at a total of 9.25 hours for Catholic Charities' fees on fees request); Pl.'s Reply at 3 ("Catholic Charities deserves to be paid for 9.25 hours for 'fees on fees.'").

[20] The Court will exclude the following time entries: .8 hours on June 23, 2015, for "preparing Rule 56 motion as to 9th cause of action [ECF #17]"; .5 hours on July 25, 2015, for "review of Answer and ECF #17"; 1.1 hours on August 1, 2015, for "writing Reply, re ECF #17"; and .6 hours on August 3, 2015, for "Reply to DHS response [ECF #23]."  See Pl.'s Mem., Ex. B (Itemization of Hours).

complete such tasks, see EPIC v. Nat'l Sec. Agency, 87 F. Supp. 3d 223, 235 (D.D.C. 2015)

("The essential goal [in examining fee requests] . . . is to do rough justice, not to achieve auditing

perfection." (quoting Fox v. Vice, 563 U.S. 826, 838 (2011))).

Regarding Catholic Charities' fees on fees request, the defendant argues that those hours

should be reduced for two reasons.  See Def.'s Resp. at 9–10.  First, it argues that Catholic

Charities' counsel "spent excessive time on its fees petition," id. at 9, because its request

"exceeds the fees requested for litigating its underlying motion," id. at 10 ("[F]ully [fifty-five

percent] of the total fees requested by Catholic Charities relate solely to its fees petition and not

to litigating the underlying claim on which it prevailed."), and on that basis, it "proposes a

[thirty-three percent] reduction (i.e., 3.05 hours) to Catholic Charities' fees[ ]on[ ]fees time,

which will allow [Catholic Charities] to be compensated for 6.20 hours devoted to fees."  Id.

Second, the defendant argues that Catholic Charities' fees on fees award "should . . . be reduced

by [thirty-seven percent] to account for its lack of substantial success on its [fees] motion."

Def.'s Resp. at 10.[21]  In other words, the defendant contends that "the 9.25 hours attributed to its

fees petition should be reduced by the same percentage that its overall fee award must be

reduced."  Id. at 6.

It "is settled in this circuit" that "[h]ours reasonably devoted to a request for fees are

compensable."  Noxell Corp. v. Firehouse No. 1 Bar–B–Que Rest., 771 F.2d 521, 528 (D.C. Cir.

1985) (citing Sierra Club v. EPA, 769 F.2d 796, 811 (D.C. Cir. 1985)).  "However, 'fees on fees'

must be reasonable, and not excessive."  Boehner v. McDermott, 541 F. Supp. 2d 310, 325

---

[21] Catholic Charities counters that such a reduction is inappropriate because "[t]he motion for summary judgment on the Ninth Cause of Action was granted," and "Catholic Charities was 100[ percent] successful."  Pl.'s Reply at 3. However, the Court construes the defendant's argument as only relating to the success of Catholic Charities' fees request, not Catholic Charities' request for the FOIA Guide.  See Def.'s Resp. at 7 ("Courts regularly conclude that fees on fees should be reduced to exclude time spent on unsuccessful fee requests." (emphasis added) (quoting EPIC, 197 F. Supp. 3d at 297)).

(D.D.C. 2008) (citation omitted).  "Courts, therefore, 'have an obligation to scrutinize the hours spent preparing the fee petitions to insure that the total is reasonable and that it does not represent a windfall for the attorneys.'"  Id. (citation omitted).

Upon careful review of the billing records submitted by Catholic Charities for its fees on fees request, the Court is satisfied that its request is not excessive.  Again, although several of Catholic Charities' entries are less precise than would be ideal, it is the Court's view that a total of 9.25 hours is a reasonable amount of time to spend on preparing a motion for attorney's fees, a memorandum in support of that motion, and two exhibits, including the declaration of Catholic Charities' attorney.[22]  Catholic Charities even appears to under-bill for its time expended drafting, as opposed to researching, its substantive motion and memorandum.  See Pl.'s Mem., Ex. B (Itemization of Hours) (claiming only 1.1 hours for "assembling motion for attorney fees; itemizing fees" and 1.25 hours for "re-reading, improving, and filing motion for fees").

The defendant's contention that Catholic Charities' fees on fees request is unreasonable because it exceeds the underlying fees request, without more, is unpersuasive.  It is the defendant's burden to provide "specific contrary evidence" to rebut the reasonableness of a prevailing party's request, Covington, 57 F.3d at 1110, and as Catholic Charities correctly points out, "the [defendant] has not identified any particular item that was excessive," Pl.'s Reply at 11, or otherwise presented evidence to satisfy its burden, see Judicial Watch, 774 F. Supp. 2d at 232 (rejecting the defendant's argument that 72.05 hours for a summary judgment motion were excessive because the defendant "fail[ed] to explain why any particular time entry is

---

[22] The Court notes that one of Catholic Charities' time entries records 1.2 hours for "preparing . . . exhibits A, B, [and] C" in conjunction with the preparation of its renewed motion requesting attorney's fees, but there is no Exhibit C attached to Catholic Charities' motion.  See Pl.'s Mem., Ex. B (Itemization of Hours).  The Court does not find this error significant, however, given that 1.2 hours is a reasonable amount of time to spend preparing Catholic Charities' Exhibits A and B.

unreasonable").  Additionally, the decision the defendant cites in support of its position, Judge

Kessler's decision in <u>EPIC</u>, <u>see</u> Def.'s Resp. at 10, does not counsel otherwise.  Although it is

true that the court in that case reduced a fees on fees award that it found to be "roughly

equivalent to the amount of time [the plaintiff] spent on [the underlying] summary judgment

[motion]," it only did so by excluding specific time entries it found to be inappropriate.  <u>See</u>

<u>EPIC</u>, 218 F. Supp. 3d at 52 (excluding "entries related to basic timekeeping, such as 'review

billing records' and 'enter billing records,' which total[ed] nearly one-third of [the plaintiff]'s

fees on fees request").  It did not, as the defendant asks this Court to do here, reduce the fees on

fees award by some arbitrary percentage, solely on the basis of the award being roughly

equivalent to the fees incurred for the underlying motion.  <u>See id.</u>  In sum, this Court agrees with

Catholic Charities that "9.25 hours is a modest amount of time," Pl.'s Reply at 11, and

accordingly, will award fees on fees for that entire amount.[23]

  Despite finding that Catholic Charities' requested fees on fees hours are reasonable, the

Court nonetheless agrees with the defendant that Catholic Charities' total fees on fees award

should be reduced to account for its limited success on its fees motion.  Catholic Charities'

success is limited in light of the Court's determination that Catholic Charities should be

compensated at the rates set forth in the USAO Matrix, as well as the determination that three

hours of Catholic Charities' time must be excluded from its award.  Therefore, the Court agrees

with the defendant, <u>see</u> Def.'s Resp. at 10, that the proper course is to reduce Catholic Charities'

fees on fees award by the same percentage that its underlying fees on the merits were reduced,

---

[23] The Court notes that Catholic Charities has not requested fees for any of its time expended preparing its reply to the defendant's response to the Court's February 3, 2017 Order to show cause why Catholic Charities should not receive the fees it requested.  <u>See generally</u> Pl.'s Mem.; Pl.'s Reply.  The Court therefore will not compensate Catholic Charities for that time.

see EPIC v. Dep't of Homeland Sec., 982 F. Supp. 2d 56, 61, 64 (D.D.C. 2013) (awarding the plaintiff "the same percentage of fees for fee litigation as it does for fees on the merits"); Judicial Watch, Inc. v. Dep't of Justice, 878 F. Supp. 2d 225, 241 (D.D.C. 2012) (Walton, J.) (same).

Based on the foregoing analysis, the Court will award Catholic Charities $5,255.78 in attorney's fees, in accordance with the calculations attached to this Memorandum Opinion.  See Memorandum Opinion, Attachment 1 (Fee Calculations).[24]  In addition, the Court will award Catholic Charities $400 in costs, representing the filing fee paid to the Court for this action, see Pl.'s Mem., Ex. A (Cleveland Decl.) at 4, as those costs are undisputed by the defendant.

## **CONCLUSION**

For the reasons stated above, the Court grants in part and denies in part Catholic Charities' motion for attorney's fees and costs.  The Court concludes that Catholic Charities is both eligible for and entitled to an award of attorney's fees and costs for its time expended litigating its ninth cause of action, but concludes that the requested award must be reduced for the various reasons explained herein.  Accordingly, the Court awards Catholic Charities attorney's fees in the amount of $5,255.78 and costs in the amount of $400.

**SO ORDERED** this 21st day of December, 2017.[25]

REGGIE B. WALTON
United States District Judge

---

[24] The Court recognizes that the USAO Matrix does not purport to apply to work performed prior to June 1, 2015. See Def.'s Resp., Ex. 3 (USAO Attorney's Fees Matrix: 2015–2017).  However, in light of the fact that Catholic Charities only performed 1.8 hours of work prior to that date, see Pl.'s Mem., Ex. B. (Itemization of Hours), the Court does not find it necessary to separately assess the merits of the now-defunct USAO Laffey Matrix, and will therefore apply the USAO Matrix rate for 2015–2016 to those pre-June 1, 2015 hours.  See EPIC, 87 F. Supp. 3d at 235 ("The essential goal [in examining fee requests] . . . is to do rough justice, not to achieve auditing perfection." (quoting Fox, 563 U.S. at 838)).

[25] The Court shall contemporaneously issue an Order consistent with this Memorandum Opinion.

**ATTACHMENT 1**

**Catholic Charities' Fees**

| Date | Hours Requested | LSI Laffey Rate | Amount Requested | Hours Awarded | USAO Matrix Rate | Amount Awarded | Percentage Reduction |
|------|-----------------|-----------------|------------------|---------------|------------------|----------------|----------------------|
| June 1, 2014 – May 31, 2015 | 2.1 | $ 789.00 | $ 1,656.90 | 2.1 | $ 568.00 | $ 1,192.80 | |
| June 1, 2015 – May 31, 2016 | 5.0 | $ 796.00 | $ 3,980.00 | 2 | $ 568.00 | $ 1,136.00 | |
| June 1, 2016 – May 31, 2017 | 0.9 | $ 820.00 | $ 738.00 | 0.9 | $ 581.00 | $ 522.90 | |
| **Totals** | **8.0** | | **$ 6,374.90** | **5** | | **$ 2,851.70** | **55%** |

**Catholic Charities' Fees on Fees**

| Date | Hours Requested | LSI Laffey Rate | Amount Requested | Hours Awarded | USAO Matrix Rate | Amount Awarded | |
|------|-----------------|-----------------|------------------|---------------|------------------|----------------|--|
| June 1, 2016 – May 31, 2017 | 9.25 | $ 820.00 | $ 7,585.00 | 9.25 | $ 581.00 | $ 5,374.25 | |
| | | | | | | $ (2,970.17) | (55% reduction) |
| | | | | | | **$ 2,404.08** | |

**Total Amount Awarded   $ 5,255.78**